STATE of Missouri,
Plaintiff–Respondent,

v.

Timothy GRANT, Defendant–Appellant.

Timothy GRANT, Plaintiff–Appellant,

v.

STATE of Missouri,
Defendant–Respondent.

Nos. 54673, 56449.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 13, 1990.

Timothy A. Braun, Capital Conflicts Defender, St. Charles, Robert C. Wolfrum, Asst. Capital Conflicts Defender, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SATZ, Presiding Judge.

Defendant was convicted by a jury of one count of Second Degree Murder, § 565.021 RSMo.1986, two counts of First Degree Assault, § 565.050 RSMo.1986, and three counts of Armed Criminal Action, RSMo § 571.015 RSMo.1986. He appeals these convictions. He also appeals the denial of his Rule 29.15 motion. We reverse and remand defendant's convictions. We dismiss his Rule 29.15 appeal as moot.

The first trial of defendant on these charges ended in a mistrial. The sufficiency of the evidence at the second trial is not in issue here. According to the state's evidence, defendant and his brother, Sam Grant, went to the Phoenix Saloon on the evening of December 26, 1986. Also at the Phoenix Saloon were Jerry Fitzgerald, Carl Luper [1], Steve Mackenberg, Eugene Jett and Tommy Tuttle. Fitzgerald and Luper were there with one group of people. Mackenberg, Jett and Tuttle were there together with another group.

At some point in the evening, Luper left the bar for several minutes. When he came back, he told Fitzgerald that he had just gotten into a fight outside. Fitzgerald and Luper then left the bar together, just to see what was going on. When Luper and Fitzgerald got outside, defendant looked directly at the two men, started walking toward them and pulled out a knife.

When defendant and Luper were facing off, Mackenberg, Jett, Tuttle, and the rest of their party, left the bar. Tuttle, a bouncer, picked up Sam Grant and placed him on the hood of a car, saying there would be no more fighting. Defendant turned from Luper, walked toward the other group, and stabbed Mackenberg, Jett and Tuttle. Tuttle died from his stab wounds. Defendant was charged with the murder of Tuttle, the assaults of Jett and Mackenberg, and three counts of armed criminal action.

In his direct appeal, defendant challenges a number of the trial court's rulings. Two of these rulings prejudiced defendant. Either one would be sufficient cause for reversal. We address each.

We adopt Luper for our opinion.

---

1. There was some equivocation at trial about whether Carl's last name was Luper or Westfall.

Defendant's sole defense was self-defense. He testified in his own behalf and also called his brother Sam Grant as a witness. Their testimony either contradicted the state's evidence or explained and justified defendant's conduct. Defendant testified that he was not the aggressor; he did not initiate the fight; he merely drew his knife in defense of himself and his brother against the verbal and physical attacks of others. Sam Grant corroborated defendant's testimony that defendant acted in response to an attack.

In cross-examining Sam Grant, the prosecutor attempted to impeach him by use of a statement Sam gave to the police shortly after the incident in issue occurred. The prosecutor noted a number of facts Sam Grant testified to at trial that Sam did not mention in his statement to police. This statement was videotaped.

On re-direct examination, defendant attempted to rehabilitate Sam by offering the videotape into evidence to show Sam was under stress at the time his statement was taken. This stress, defendant contended, would explain the omissions in Sam's statement. The trial court refused to admit the videotape into evidence. Defendant now contends this refusal was prejudicial error. We agree.

As an example of the prosecutor's cross-examination of Sam, the following exchange took place:

Q. Well, they asked you what kind of knife it was, they asked for a description, didn't they?

A. Sir, I was under a lot of stress when I made that statement out. I didn't know what end was up.

Q. Now, today you've testified that you heard threats made against you and your brother, verbal threats; is that correct?

A. Yes.

Q. And you never told that to the police when you made your statement on December 27th, did you?

A. I don't know. I told you I was under a lot of stress when I made the statement.

. . . .

Q. Well, you knew an ongoing investigation was being conducted, didn't you? When did this memory come back to you, that you had—that people had been threatening you and your brother verbally?

When did you all of a sudden remember that?

A. I probably remembered it right then but just didn't say that. Like I said, I was under a lot of stress when I made that out.

Then, as noted, on re-direct examination, defendant requested leave to play the entire videotape of Sam's statement to the jury to show the stress Sam was under at the time he made this statement. The prosecutor objected to the showing of the tape because, he contended, Sam could verbally describe what his condition was at the time he made his statement. The court sustained the prosecutor's objection. After questioning Sam briefly about his prior statement, defendant again asked to play the tape. Again, the court sustained the prosecutor's objection.

On re-cross examination, the prosecutor again attempted to impeach Sam, this time by eliciting the fact he had not previously told the police he was afraid for his life, in order to suggest that defendant's theory of self-defense was developed solely for trial. On re-re-direct, defendant again asked for leave to play the tape. Again, the court sustained "the same objections as before". Finally, at the close of defendant's case, defendant again offered the tape into evidence and asked to play it for the jury. The prosecutor raised the "[s]ame objection", and the court made the "[s]ame ruling."

On appeal, defendant first argues that, during trial, the prosecutor agreed to permit the videotape to be introduced into evidence. Defendant also argues the refusal to admit the videotape into evidence to show Sam's stress is prejudicial error whether a bargain to do so existed or not. We agree with defendant's second argument and, therefore, do not address his

first. As to the second argument, the state admits the trial court may have erred, but argues the error was harmless because the contents of the tape were properly before the jury. We disagree.

Errors committed in a criminal trial are presumptively prejudicial. *Burton v. State*, 641 S.W.2d 95, 99 (Mo. banc 1982). The presumption may be rebutted by the facts in a particular case. *Id.* The state relies on *State v. Williams*, 742 S.W.2d 616 (Mo.App.1987), to support its argument that the error here was harmless.

*Williams* is distinguishable. In *Williams*, the contents of the defendant's statement to the police were in issue. In affirming the trial court's denial of the defendant's request to show the videotape of his statement to the jury, our colleagues in the Western District said the contents of the tape were already before the jury, and, therefore, even if the trial court's denial was error, it was not prejudicial error. *Id.* at 618–619.

Here, the issue is not the contents of Sam Grant's statement; rather, the issue is the manner in which he made his statement. At trial, Sam testified he failed to tell the police about certain matters raised by the state because he was "under a lot of stress" when he made his statement. His credibility was in issue. The precise issue was whether his explanation for the omissions in his prior statement was credible. Merely hearing him say he was under stress is significantly different from actually seeing his demeanor and the manner of his speech that could show the stress. Indeed, a jury is specifically instructed that "[i]n determining the believability of a witness and the weight to be given to testimony of the witness, you may take into consideration the witness' manner while testifying; ..." MAI–CR3d 302.01. And, on appeal, we consistently emphasize that the proper determination of a witness's credibility depends in large part upon his demeanor and manner of testifying. *See, e.g. State v. Skillman*, 128 S.W. 729, 731 (Mo. 1910). If these statements are to make sense in the present context, they must mean the jury should have been allowed to observe Sam's demeanor and manner at the time he made his statement to the police, in order to determine whether his explanation based on stress was credible. But, the jury was denied this opportunity and was limited to his explanation at trial: "I was under a lot of stress."

We have reviewed the videotaped statement. Sam Grant appeared unsteady and tense. At one point in the statement, when describing defendant's actions, he broke down and began crying. Throughout the interview, his voice was cracking, perhaps, from the strain of the night's events. None of these signs of stress can be captured by his testimony at trial that he was "under a lot of stress". This statement simply does not convey to the jury the degree or intensity of the stress that is evident from the videotape. Quite simply, a picture is worth a thousand words. Logic and fairness required the pictures of Sam making his statement be made available to the jury.

It was error not to admit the videotape into evidence. We can declare this error to be harmless only if we believe the error was harmless beyond a reasonable doubt. *State v. Miller*, 650 S.W.2d 619, 621 (Mo. banc 1983). We cannot do so.

Defendant raises a second dispositive issue. Prior to the first trial, the state had audiotaped interviews of at least six of its endorsed witnesses: Jerry Fitzgerald, Eugene Jett, Steve Mackenberg, Linda Jett, James Needy and Steve Green. Defendant made a timely written request for the "written or recorded statements" of the state's witnesses and for the "substance of any oral statements made by the defendant" and "a list of the witnesses to the making." The state did not disclose or furnish any of the audiotaped statements. At the second trial, the state called Jerry Fitzgerald and Eugene Jett as witnesses but did not call Steve Green. Based upon Green's testimony at the first trial, defendant called Green as his witness at the second trial.

Green had described himself as the best friend of Tom Tuttle, the deceased victim. Defendant called Green to elicit from him

the testimony he gave at the first trial that he heard Tuttle offer Carl Luper a beer if Luper would hit defendant. On cross-examination, the prosecutor elicited testimony from Green that he overheard defendant tell the police at the police station: "he didn't need a knife, that he could have whooped them without a knife." Defense counsel immediately objected, contending the statement of defendant had not been disclosed to him despite a request for discovery. The court overruled the objection because Green was called by defense counsel as a witness for defendant.

■ On the day set for sentencing, just shortly before the sentencing took place, the prosecutor appeared at defense counsel's office and disclosed to defense counsel that he had in his possession audiotaped interviews with at least two witnesses, Jerry Fitzgerald and Eugene Jett. By consent, the sentencing was continued. One week later, the prosecutor revealed that audiotaped interviews with four other witnesses had likewise not been disclosed. These witnesses were Steve Mackenberg, Linda Jett, Steve Green, and James Needy. The tapes were admitted into evidence at an evidentiary hearing on defendant's motion for a new trial on the ground, among others, that the state's failure to disclose these taped interviews prejudiced him. The trial court denied defendant's motion. Defendant now contends this denial was prejudicially erroneous. We agree.

■ If requested in writing by defense counsel, the state must disclose the written or recorded statements of the witnesses it intends to call at trial and must also disclose the substance of any oral statement made by the defendant along with names of those persons who witnessed defendant making the statement. Rule 25.03.[2] The purpose of this rule of discovery is to grant the defendant a decent opportunity to pre-

pare his case in advance of trial and avoid surprise. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc 1989). Compliance with the rule is mandatory, not discretionary. *State v. Bebee*, 577 S.W.2d 658, 660 (Mo.App. 1979). The duty to disclose rests on the prosecutor; the cause of his failure should not soften the sanction. *Id.*

■ The scope of the state's duty to disclose under Rule 25.03 overlaps, yet differs from, the scope of the state's duty to disclose under the doctrine established in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its federal progeny. *See, e.g. State v. Charity*, 637 S.W.2d 319, 322–23 (Mo.App.1982).[3] *Brady* and its federal progeny deal primarily with the constitutional implications of a prosecutor's failure to disclose evidence favorable to a defendant. In the present case, the evidence that was not disclosed—the audiotaped statements of witnesses—consisted of evidence which facially was both favorable and unfavorable to the defendant. We, therefore, decide this case on the prosecutor's failure to comply with Rule 25.03 rather than his failure to comply with the possibly relevant requirements of the *Brady* doctrine.

■ The trial court had discretion to fashion an appropriate remedy for the state's failure to comply with Rule 25.03. *State v. Kilgore, supra,* 771 S.W.2d at 66. The denial of defendant's requested sanction was an abuse of discretion, however, if the denial resulted in fundamental unfairness to defendant. *Id.* Fundamental unfairness turns on whether there was a reasonable likelihood that an earlier disclosure of the requested evidence would have affected the result of the trial. *Id.; State v. Bebee, supra,* 577 S.W.2d at 662.

The audiotapes all contain inconsistencies and potential impeachment evidence which

---

**2.** Defendant's request was based not only on Rule 25.03 but also on

"the Sixth and Fourteenth Amendments of the United States Constitution; Article I, Sections 2, 10, and 18(a) of the Missouri State Constitution; and Missouri State Supreme Court Rules 4, Ethical Rule 3.8(d), 25.01, 25.02, ... 25.04, 25.07, and 25.08."

**3.** "While disclosure under Rule 25 has constitutional underpinnings, *State v. Wilkinson,* 606 S.W.2d 632 (Mo. banc 1980), its purpose is to allow a party to prepare for trial and eliminate surprise. ... The scope of materials subject to disclosure under Rule 25 is broader than under the *Brady* doctrine." *Id.*

would have been useful to defendant at trial. The most significant evidence was contained in the prosecutor's taped interview of Steve Green. On the tape, the prosecutor informs Green that defendant will be claiming self-defense and the prosecutor urges Green to volunteer any evidence that would tend to diminish this self-defense claim. More important, Green makes several statements which, if disclosed, would have been reasonably likely to affect the outcome of the trial below. We address the most important one of these.

During the taped interview, Green said he overheard defendant tell the police that "he didn't need a knife, he could have [whipped] them without it." The prosecutor apparently realized defendant's alleged statement was a significant contradiction to a self-defense theory. He, therefore, repeatedly questioned Green about this statement Green said he overheard.

Then, at the first trial, the prosecutor called Green as a witness for the state but did not question him about defendant's alleged statement. This is understandable. Green's testimony about defendant's alleged statement would have been more appropriate as rebuttal to any testimony on behalf of defendant establishing a claim of self-defense. However, for reasons not relevant here, a mistrial was declared before the state rested its case and, thus, no opportunity for the state's rebuttal occurred.

Then, as noted, defense counsel, unaware of defendant's alleged statement, called Green as a witness in the second trial to establish the fact that Green, a friend of the deceased Tuttle, overheard Tuttle offer a beer to Carl Luper if he hit defendant. On cross-examination, the prosecutor elicited from Green the testimony that he had overheard defendant say he did not need a knife to whip the victims.

If the jury believed that defendant made this statement, his self-defense theory was destroyed. The jury was instructed that "a person may use deadly force only if he reasonably believes the use of such force is necessary to protect himself." MAI–CR3d

306.06. Thus, if defendant reasonably believed he could have defended himself without using his knife, his self-defense claim had no merit.

To insure the jury did not miss the significance of Green's testimony, the prosecutor, in closing argument, argued to the jury that defendant's use of a knife was a disproportionate response to the victims' punches and, therefore, the use of a knife was not self-defense. "And finally", the prosecutor continued,

"when you're sitting at the police station and you boast to your brother that 'Hey, I didn't need to use a knife on these guys, I could have whipped them with my own hands.' Remember, that's what Mr. Green said he overheard. When you make a statement like that, too, [it] is entirely inconsistent with a claim of self-defense."

Obviously, defense counsel was unprepared to counter Green's testimony and the prosecutor's argument. However, if defense counsel knew of Green's taped statement prior to trial, he certainly would not have called Green as his witness. Moreover, he could have made preparation to discredit Green if the state decided to call Green as witness during the second trial.

Green said he overheard defendant make his statement to the police at the police station. However, defendant's statement was absent from the police report. This absence suggests that defendant did not make the statement Green attributed to him. The prosecutor noted this, quizzically, during Green's taped interview. Without the taped interview, defendant had no reason to depose or interview the police officers about the failure to include defendant's alleged statement in the report. Understandably, the state does not argue on appeal that defendant was required to proffer the police officer's explanations at the hearing on his motion for a new trial to show prejudice. The absence of defendant's alleged statement from the police report lessened the credibility of Green's testimony regardless of any explanation

for its absence.[4]

On appeal, the state argues defendant had a duty to prepare his witnesses for trial, and, since he obviously did not interview Green prior to the second trial, defendant has no cause to complain.

A similar argument was rejected in *State v. Bebee, supra,* 577 S.W.2d at 662. Rule 25.03 does not require the requested information be unavailable by other means. *Id.*[5] Moreover, a pretrial interview might not have revealed Green's statement to defense counsel. Green, after all, described himself as the deceased Tuttle's best friend. Furthermore, Green testified at the first trial that all he could remember was what he testified to. Given that testimony by Green, defendant had no reason to waste his time or resources interviewing Green prior to the second trial.

The most important and relevant fact here, however, is the prosecutor's failure to disclose Green's taped interview. Proper compliance would have disclosed the existence of defendant's alleged statement. In preparing for trial, defense counsel reasonably relied on the prosecutor's ostensible integrity, honesty and competency. The state's argument presupposes that defendant should not have relied on the prosecutor's overt conduct. That presupposition justifies the prosecutor's witting or unwitting deception. That is the Queen's sense of fairness in Alice in Wonderland. That is foreign to us.

The prosecutor's failure to disclose Green's audiotaped statement neatly set defendant up to be destroyed by one of his own witnesses at the second trial. Given the conflicting evidence on all other issues in the case, defendant has shown a reasonable likelihood that pre-trial disclosure of Green's taped interview would have affected the outcome of the trial.[6]

We address two issues which may reoccur on retrial.

The trial court admitted into evidence State's Exhibit 21, a knife found in the van defendant and his brother used to leave the scene of the alleged crimes. Defendant argues that none of the witnesses identified this knife as the knife used by defendant; therefore, defendant reasons, the state's evidence did not connect this knife to defendant and to the crimes charged and, thus, the knife was inadmissible. We disagree.

The knife, as "[d]emonstrative evidence[,] is admissible 'if it throws relevant light upon a material matter at issue.' ... A physical object found at or near the scene of the crime, and of a type that could have been used to deliver a felling blow, cannot be said to have no relevancy or probative value." *State v. Griffin,* 756 S.W.2d 475, 483 (Mo. banc 1988), *cert. denied* — U.S. ——, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989).

The state's evidence not only showed the knife to be relevant, it connected the knife to the defendant. The police testified this knife, with an approximate five to six inch blade, was found underneath the driver's seat of the van. The knife appeared to have dried blood on its grip and blade, and a towel, also found in the van, appeared to have blood on it. The state's pathologist testified that the width of the deceased victim's wounds corresponded with the width of this knife, the knife was consistent with the instrument causing the wound, and it was more consistent with causing the wounds than a three inch knife would have been. This evidence showed the relevancy of the knife and, thus, made it admissible.

Moreover, the knife was not simply found near or around the Phoenix Saloon, it

---

4. In his taped statement, Green also said several others could have overheard defendant's statement. Those others included Jerry Fitzgerald, who testified at both trials for the state, and Keith Hart, who was endorsed by the state but not called as a witness. These people also could have been deposed or interviewed.

5. In *Bebee,* the discovery rule in effect was Rule 25.32. Rule 25.03 became effective January 1, 1980. The pertinent language of the rule is the same.

6. Although our analysis focused on the tape of Green's statement, we note that all the taped statements will be available to defendant on retrial.

was found underneath the driver's seat of the van used by defendant and his brother to leave the scene of the crimes. This was sufficient evidence to connect the knife to defendant. *State v. Bolder*, 635 S.W.2d 673, 688–89 (Mo. banc 1982).

We must note the possibility that the prosecutor may have undisclosed, countervailing evidence which prevents the knife from being connected to the defendant. Another assistant prosecutor represented the state at the hearing on defendant's pre-trial motion to suppress. During the motion that prosecutor said:

"... we are not concerned about the knife that was found in the van, that wasn't the knife that was used.

.   .   .   .   .

... if that's what's concerning [defense counsel] is statements about the knife that was found in the van, you know, it's been determined that was not the knife that was used in this incident."

Defendant also challenges as error the admission at trial of a statement he had made to the police officers prior to trial. Defendant's pre-trial motion to suppress any statement he made to the police was denied. At trial, defendant objected to the use of his statement by "renewing" his pre-trial motion to suppress. The trial court overruled this objection. We find the rulings of the motion court and the trial court proper.

At trial, the state called David Nick, a former Wentzville detective, as a witness. He testified that, shortly after this stabbing incident, defendant told him the blade of the knife he used was three to four inches long. Detective Nick also testified that, in a later statement, defendant said the blade was three inches long. Defendant objected to this testimony, contending the second statement was not "voluntarily" made because it was made after he had invoked his right to remain silent, and this invocation barred any further questioning. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant makes this same argument before us.

Two witnesses testified at the hearing on defendant's pre-trial motion to suppress.

The state called Detective Dennis Popek, and defendant called Detective David Nick. They were the officers who questioned defendant.

Detective Popek testified as follows. At the police station, he gave defendant a form reciting defendant's *Miranda* rights. Defendant read the form and signed it. He then questioned defendant about the occurrence at the Phoenix Saloon. Detective Popek did not recall defendant mentioning an attorney during the interrogation. At one point, defendant said he wanted to stop the questioning. The questioning then ceased. Subsequently, defendant was questioned at the St. Charles County Jail. Defendant was read his *Miranda* rights at this second interrogation.

Detective Nick was present at both interrogations. He testified he did not "remember" defendant saying "he didn't want to talk anymore" at the end of the first interrogation. He did not "think [defendant] did say that." Detective Nick did testify, however, that when defendant was asked to take a breathalyzer test, he replied "not without talking to an attorney" first.

In reviewing this evidence, we defer to the trial court's determination of credibility and resolution of facts in dispute. *State v. Glear*, 696 S.W.2d 820, 824 (Mo.App.1985). If there is testimonial evidence to support the judgment of the trial court, we must affirm that judgment. *State v. Harris*, 774 S.W.2d 487, 492 (Mo.App.1989).

Detective Nick testified he did not "think" defendant said he did not want to talk anymore at the end of the first interview. The trial court could have credited this testimony, and the fact that Detective Popek's testimony supports a contrary conclusion is immaterial. *State v. Lytle*, 715 S.W.2d 910, 915–916 (Mo. banc 1986). This view of the evidence supports the rulings of the trial court and motion court.

We need not rest our resolution of this issue, however, on this analysis. We find defendant's second statement was voluntarily given, even if he did seek to end the questioning during the first interrogation.

■ Questioning a suspect after he invokes the right to remain silent is not *per se* a violation of the suspect's *Miranda* rights. *Michigan v. Mosely,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The resolution of the issue turns on whether the suspect's right "to cut off questioning" has been "scrupulously honored." *Id.* at 104, 96 S.Ct. at 326.[7]

In *Mosely,* the court relied on three factors to find the defendant's right to remain silent was scrupulously honored: 1) the interrogation immediately ceased when the defendant said he did not want to talk anymore; 2) there was a significant passage of time between the invocation of the right to remain silent and the second interrogation, and a fresh set of *Miranda* warnings preceded the resumption; and 3) the renewed interrogation related to a different crime. *Mosely, supra,* at 106, 96 S.Ct. at 327.

■ The mere fact the subsequent interrogation is about the same crime, however, does not compel the conclusion the suspect's right to cut off questioning was not scrupulously honored. *See Kelly v. Lynaugh,* 862 F.2d 1126, 1131 (5th Cir. 1988) *cert. den.* — U.S. —, 109 S.Ct. 3263, 106 L.Ed.2d 608 (1989); *United States v. Udey,* 748 F.2d 1231, 1242 (8th Cir.1984) *cert. den. sub nom. Ginter v. United States,* 472 U.S. 1017, 105 S.Ct. 3478, 87 L.Ed.2d 613 (1985); *Jackson v. Wyrick,* 730 F.2d 1177, 1180 (8th Cir.1984) *cert. den.* 469 U.S. 849, 105 S.Ct. 167, 83 L.Ed.2d 102 (1984). But, if the second interrogation does concern the same subject matter as the first, the purpose behind reinitiating interrogation cannot be to wear down the suspect or convince him to change his mind. *Kelly, supra,* 862 F.2d at 1131; *Jackson, supra,* 730 F.2d at 1180.

■ The second interrogation in the instant case met the standards set in *Mosely.* Detective Popek testified the first interrogation ceased immediately after defendant said he wanted the questioning to stop.

There is evidence from which the trial court could have found that three days passed between the first and second interrogations. *Compare, Kelly, supra,* 862 F.2d at 1130 (5 hours between first and second interrogation; 4 to 6 hours between the second and third interrogation); *Udey, supra,* 748 F.2d at 1242 (6 hours between first and second interrogation; 48 hours between second and third interrogation); *Jackson, supra,* 730 F.2d at 1180 (24 hours between first and second interrogation).

Moreover, when questioned why the second interrogation was initiated, Detective Popek said other witnesses had been interviewed after the first interrogation and he wanted to talk with defendant about the additional information those witnesses gave. Nothing in the record indicates the police "persist[ed] in repeated efforts to wear down [defendant's] resistance and made him change his mind." *Mosely, supra,* 423 U.S. at 105–06, 96 S.Ct. at 327. On this record, the interrogations met the *Mosely* standard.

Judgment reversed. Cause remanded.

SMITH and GRIMM, JJ., concur.

7. In *Mosely,* the court noted a distinction between the defendant's right to remain silent and his right to counsel. *Mosely,* 423 U.S. at 104, fn. 10, 96 S.Ct. at 326, fn. 10. We do not address the effect of a defendant's invocation of his right to counsel. *See, United States v. Udey,* 748 F.2d 1231, 1241, Fn. 5 (8th Cir.1984).