STATE of Missouri, Respondent,

v.

Irvin GARDNER, Appellant.

Irvin GARDNER, Movant,

v.

STATE of Missouri, Respondent.

No. 69425.

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 18, 1997.

Gary E. Brotherton, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gregory L. Barnes, Asst. Atty. Gen., Jefferson City, for Respondent.

SIMON, Judge

Irvin Gardner (appellant) appeals from a sentence entered on a jury verdict finding him guilty of first degree robbery and armed criminal action. Appellant contends that the trial court erred in overruling: (1) his objection and letting State elicit Officer Arnett's opinion that appellant was the man in the surveillance video but then precluded appellant from rebutting that opinion; and (2) his motion to suppress his November 18 state-

ment. Additionally, appellant contends that the motion court erred in overruling his Rule 29.15 Motion because a review of the record leaves the definite and firm impression that post-conviction counsel rendered ineffective assistance in that they failed to act as reasonably competent attorneys when they relied solely on the testimony of appellant to prove the claims that trial counsel was ineffective in failing to call certain witnesses. We affirm.

The record viewed in the light most favorable to the verdict reveals that about 8:20 p.m. on October 28, 1994, a man entered the Vickers Gas Station (station at 9601 Manchester Road in St. Louis County and pointed a knife towards the face of the cashier, Charles Meyers (Meyers), waiving it around Meyers' face and chest and demanding that Meyers open the cash register. Elizabeth McGregor was at the check-out counter attempting to pay for her gas when the man entered the station. Meyers opened the cash register, and the man grabbed money out of the register and left the store. After he left, Meyers locked the door and called the police. When the police arrived, Meyers gave them the station's surveillance videotape (videotape), which recorded the incident. Later that evening, Meyers viewed the videotape at the police station and told detectives he would be able to identify the man. Sergeant Paul Arnett (Arnett) was assigned to assist in the investigation of the incident and viewed the videotape, recognizing the man on the tape as appellant.

On November 18, 1994, appellant was interviewed at the Rock Hill Police Station. Arnett went through a waiver of rights form, informing appellant of his *Miranda* rights. Appellant indicated he understood those rights and would waive those rights and make a statement. Arnett then informed appellant of the charge of robbery first, and appellant indicated he had no idea of what Arnett was talking about and would not make any statement at that time. Arnett showed appellant the videotape and asked him to stand next to the monitor to compare appellant to the man on the videotape. Arnett told appellant that it was him on the tape "without a doubt." Appellant stated

that the man on the videotape "must be his twin."

On January 26, 1995, Arnett and two other officers were outside the courtroom waiting to testify in another trial when appellant approached them and inquired as to what Arnett was doing. Arnett told appellant that they were there to testify on a case involving Charles Moring. Appellant stated, "he'll walk like I did," and told Arnett that he had an alibi that Arnett couldn't beat. Arnett replied he didn't care about appellant's false alibis because he had him on videotape. Appellant stated that "that might be me on the tape, but you guys put me on there." Arnett asked how that was possible, and appellant responded that "[you] cut the head off of a picture and had it imposed on the tape."

Appellant was charged by amended information with first degree robbery and armed criminal action as a class X offender, pursuant to Sections 558.016, 558.019 and 557.036.4 RSMo 1994.

The morning of trial, appellant requested an in-chambers conference regarding Arnett's identification of appellant on videotape, contending that allowing Arnett to testify that appellant is the man on videotape would be making a conclusion as to the ultimate question in the case and therefore, invade the province of the jury. He also requested to call rebuttal witnesses in the event such testimony was allowed. State contended that the identification would not be invading the province of the jury but would be Arnett's opinion and belief that appellant is the man on the tape. The court ruled that if sufficient foundation was laid for the testimony such as the length of time Arnett knew appellant and frequency of viewing appellant, he could give his opinion as to whether or not appellant is depicted on the tape if the testimony is couched in terms of an opinion. With regards to rebuttal witnesses, the court noted appellant had not endorsed anybody to testify in this regard and stated it would make a decision later on that morning.

At trial, state called McGregor, Meyers and Arnett to testify. McGregor testified as to the incident at station and stated, in pertinent part, that she was standing to the side of the man who had the knife, saw only his

profile, could not identify him and was never asked to view a lineup. Meyers also testified as to the incident at station and the videotape stating, in pertinent part, that the man who robbed him at the register was no more than a couple of feet away and held his right arm up shading a part of his face, videotape in station recorded the incident, and the videotape accurately depicts the events that occurred that evening. Meyers also identified videotape, which was offered into evidence, as the tape that he put into and took out of station's machine that night and identified appellant as the man who threatened him with the knife and took the money out of the cash drawer. On cross-examination, Meyers stated that he was never shown a lineup or any photographs. Arnett testified as to his investigation and interview of appellant, stating that he viewed videotape the night of the robbery and could recognize the man on it. Appellant objected to Arnett's identification on the basis of lack of foundation, which was overruled. Arnett testified that in his opinion, appellant was the man on videotape, he had known him for approximately ten years, and pointed him out in the courtroom. Arnett also stated that on November 18, 1994, he interviewed appellant at the station, initially reading him his *Miranda* rights and going through a waiver of rights form with him, which appellant initialed and signed. The following testimony was elicited, in pertinent part:

Arnett: I advised him he was here for a charge of robbery first, and asked him if he wanted to tell me about it.

State: What did he say?

Arnett: He said that he had no idea of what I was talking about and wouldn't make a statement at that time.

* * *

State: How did he react when you showed him the videotape?

Arnett: He was real nervous. As soon as he came on the picture, he kept averting his eyes away from it and looking down at the ground.

State: After you viewed the videotape what did you do?

Arnett: I then stood him up to the monitor, compared him to the person on the tape. In my opinion it was, without a doubt, the suspect.

State: Did you take him back to your office then?

Arnett: Yes, I did.

State: Did he deny it was him on the tape?

Arnett: Yeah. I asked him if— now what he had to say for himself.

State: What did he say?

Arnett: He said, "that wasn't me." I said, "how can you say that isn't you when you just seen yourself on tape committing the robbery?" He goes, "Well, that had to be my twin brother."

State: Did he tell you that he had a twin brother?

Arnett: At that time, yeah.

State: Did he have a twin brother?

Arnett: No, he has not.

* * *

Following the above testimony, Arnett stated that he questioned appellant regarding his whereabouts the night of the robbery, and appellant told him that he had been drinking with two individuals until about 6 p.m.; went to another individual's house until about 9:30 p.m.; and thereafter went to his girlfriend's house for the remainder of the night, calling in sick to work that night because he was too drunk. Appellant made no objections during the above testimony. Additionally, Arnett stated that he did not conduct a photo or live lineup with McGregor and Meyers because "in my mind, there was positively [appellant] on the tape. It should have been done just so we have more evidence, but I just messed up. I'm sorry." and testified as to the January 26, 1995 encounter at the courthouse with appellant where appellant said "that might be me on the tape, but you guys put me on there ... [you] cut the head off of a picture and had it imposed on the tape."

Then, state rested, and the trial court, in chambers, made a record, stating that the reason for Arnett's opinion testimony was "because the quality of the tape is very poor and in portions of the tape [appellant's] face was obscured— at least partially obscured

by an arm and that this officer—at least I was told this officer was going to testify he knew [appellant] for—I think he testified here this morning for approximately ten years." Also, the court ruled that appellant would not be able to call witnesses to give an opinion as to whether or not the man depicted in the videotape was appellant, stating "it's fundamentally unfair to the state to allow [appellant] to call these witnesses which he would like to portray as rebuttal witnesses when in fact, one, his intention to call these people and second, the ID of these people was not previously disclosed to the state." After the jury was recalled, appellant rested. Jury returned with a verdict of guilty of first degree robbery and armed criminal action. Subsequently, the trial court sentenced appellant as a prior and persistent offender to concurrent terms of twenty years imprisonment.

On May 2, 1996, appellant filed a *pro se* Rule 29.15 motion, which was subsequently amended by appointed counsel. The motion court denied relief following an evidentiary hearing on appellant's claim that his trial counsel should have called certain witnesses.

■ In his first point which contains two subpoints, appellant contends that the trial court erred or plainly erred and abused its discretion in overruling appellant's objections and letting state elicit Arnett's opinion that appellant was the man in the surveillance video but then precluded appellant from rebutting that opinion. In his first subpoint, appellant contends that Arnett's opinion invaded the province of the jury and was far more prejudicial than probative and the jury simply deferred to Arnett's opinion.

■ Initially, we note that the videotape is not part of the record on appeal. The trial court stated that "the quality of tape is very poor and in portions of the tape [appellant's] face was obscure—at least partially obscured by an arm ... " and that Arnett could testify as to "his opinion as to whether or not [appellant] is depicted on the tape." The trial court enjoys considerable discretion in admitting opinion evidence because it is in a superior position to assess the probative value and competency of opinion evidence. *State v. Reilly*, 674 S.W.2d 530, 533 (Mo.1984). Gen-

erally, opinion testimony is inadmissible when the trier of fact is as capable as the witness to draw conclusions from the facts provided. *State v. Futo*, 932 S.W.2d 808, 819 (Mo.App.1996).

■ While we have not directly addressed the admissibility of lay opinion testimony involving surveillance videotapes, lay opinion testimony has generally been allowed in two circumstances: (1) to provide the jury with descriptive facts that otherwise could not be detailed or reproduced for the jury; and (2) to give a judgment on matters where witness is shown to have an opinion which would aid the jury. Opinions aiding the jury have included: (1) in-court identifications of individuals based upon observations during an incident, *see State v. Linzia*, 412 S.W.2d 116, 120 (Mo.1967); (2) the nature, condition and identity of objects, *see State v. Dudley*, 912 S.W.2d 525, 527 (Mo.App.1995); (3) the identity of handwriting; *see State v. Sanders*, 714 S.W.2d 578 (Mo.App.1986); (4) intoxication based upon observations of driving and personal actions, *see State v. Meanor* 863 S.W.2d 884, 887 (Mo.banc 1993); (5) the competency of individuals, *see Pike v. Pike*, 609 S.W.2d 397, 403 (Mo.banc 1980); and (6) the value of one's own realty or personal property, *see State v. Reilly*, 674 S.W.2d 530, 533 (Mo.banc 1984). Additionally, lay opinion of voice identification of an audio tape is admissible as a foundation for introduction of the tape. *State v. Plummer*, 860 S.W.2d 340, 345 (Mo. App.1993).

A review of opinions from other jurisdictions has been informative. In *United States v. Farnsworth*, 729 F.2d 1158, 1159 (8th Cir. 1984), three lay witnesses, including two parole officers, testified at trial as to the identity of a robber on a bank surveillance photographs to buttress identifications by bank employees who witnessed the robbery. None of the lay witnesses were at the robbery scene, but all knew the accused prior to the robbery. *Id.* The court of appeals noted that lay witness testimony is limited to those opinions or inferences which are: (1) rationally based on the perception of the witness; and (2) helpful to a clear understanding of the witness' testimony or the determination

of a fact in issue. *Id.* at 1160 n. 2; Fed. R.Evid. 701. The court of appeals held that the lay witness's identifications were admissible, stating that a lay witness opinion concerning the identity of a person depicted in a surveillance photograph is admissible "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *Id.* at 1160. *See also e.g. United States v. Jackman,* 48 F.3d 1 (1st Cir.1995); *United States v. Allen,* 787 F.2d 933 (4th Cir.1986), judgment vacated on other grounds, 479 U.S. 1077, 107 S.Ct. 1271, 94 L.Ed.2d 132 (1987); *United States v. Stormer,* 938 F.2d 759 (7th Cir.1991); *United States v. Wright,* 904 F.2d 403, 405 (8th Cir.1990); *United States v. Langford,* 802 F.2d 1176 (9th Cir.1986); *United States v. Borrelli,* 621 F.2d 1092 (10th Cir.1980); *Ex Parte Rieber,* 663 So.2d 999, 1011–12 (Ala. 1995); *State v. King,* 180 Ariz. 268, 883 P.2d 1024, 1036 (1994); *Nooner v. State,* 322 Ark. 87, 907 S.W.2d 677, 685 (1995); *State v. Benton,* 567 So.2d 1067, 1068 (Fla.App. 2 Dist.1990); *Harper v. State,* 213 Ga.App. 444, 445 S.E.2d 303, 308 (1994); *State v. Loftin,* 287 N.J.Super. 76, 670 A.2d 557, 569 (N.J. Super A.D.1996); and *People v. Russell,* 79 N.Y.2d 1024, 584 N.Y.S.2d 428, 429, 594 N.E.2d 922, 923 (N.Y.App.1992).

A case that is strikingly-similar to this case, *State v. Robinson,* 908 P.2d 1152, 1154 (Colo.App.1995), involved an individual's appeal of his sentence following a jury verdict for one count of aggravated robbery, contending that the trial court erroneously allowed a police detective to identify him on a surveillance videotape. During the trial, the evidence disclosed that a cashier at a convenience store was robbed at knife-point by a male who was wearing a cap, plastic sunglasses with a missing lens over the left eye, a long-sleeved sweatshirt, jeans, and white shoes. *Robinson,* 908 P.2d at 1154. After the robbery, the store's surveillance videotape, which had recorded the incident, was placed for various officers to determine if they could identify the robber. *Id.* A detective recognized the man on the videotape and subsequently the individual was arrested. *Id.* Defense counsel objected to the detective's videotape identification because: (1)

the detective had arrested individual for another alleged crime the previous year and an effective cross-examination would be precluded; and (2) the identification testimony would usurp the function of the jury. *Id.* at 1154–55. The trial court permitted the detective's identification, prohibiting any testimony related to prior arrests or investigations. *Id.* at 1155. On appeal, individual argued, in pertinent part, that the identification was improperly admitted because it was not helpful to the jury and violated Colorado's adoption of Fed.R.Evid. 403 and individual's constitutional right to confrontation. *Robinson,* 908 P.2d at 1155–56. The Colorado Court of Appeals upheld the trial court's ruling, stating, in pertinent part:

> The surveillance videotape is less than clear. It shows, for the most part, only a profile view of the robber ... Here, the detective's testimony was rationally based on his knowledge of the defendant's appearance. In addition, since identity was an issue in the case, the testimony was helpful to a clear understanding of a fact in issue. *Id.*

\* \* \*

The Supreme Court of Colorado, en banc, affirming, stated, in pertinent part:

> [W]e hold that, although the witness must be in a better position than the jurors to determine whether image captured by the camera is indeed that of the defendant, this requires neither the witness to be "intimately familiar" with the defendant nor the defendant to have changed his appearance ... [T]he trial court properly admitted Detective Russell's lay opinion testimony if there was some basis for concluding that Detective Russell was more likely to correctly identify Robinson from the photograph than was the jury ... The record before us indicates that the robber depicted in the surveillance photographs was wearing a cap and sunglasses. The record also indicates that the photographic image of the robber in the videotape is unclear as to the robber's identity. Thus, although Robinson's appearance did not change from the time the photograph was taken to the time of trial, lay opinion testi-

mony by a witness familiar with Robinson's appearance would have been helpful to the jury in determining whether Robinson was indeed the robber in the photograph. *Robinson v. State*, 927 P.2d 381, 384 (Colo.1996).

Here, Arnett's identification provided assistance to the trier of fact because of the poor quality of the tape and appellant's obscuring part of his face with his arm. Arnett's testimony was sufficiently probative to outweigh the danger of unfair prejudice, given his familiarity of the appellant for ten years. Further, his identification was not the sole identification evidence but supplemented Meyers' identification and the images on the video, which the jury viewed.

 Appellant also contends that the jury may have simply deferred to Arnett's opinion, noting that the jury wrote the court during deliberations, "Is it the jury's obligation to identify the appellant in the video? or accept the verbal testimony?" and the court responded by referring the jury to the package of instructions. While our review of the record shows that the jury made this inquiry, there is no indication the jury simply deferred to Arnett's opinion in light of the other relevant evidence in the record. Appellant's subpoint is without merit.

 In his second subpoint, Appellant contends that once Arnett's opinion was improperly admitted, fundamental fairness demanded that the trial court let appellant's mother testify despite his failure to disclose her as a defense witness before trial. Although appellant describes this witness as a rebuttal witness, the witness is in reality a defense witness who would rebut the state's case.

 Trial courts possess broad discretion in permitting the late endorsement of witnesses. *State v. Williams*, 853 S.W.2d 371, 373 (Mo.App.1993). A reviewing court will only reverse for an abuse of discretion resulting in fundamental unfairness. *Id.* As a matter of law, no abuse of discretion exists when the court refuses to allow the late endorsement of a defense witness whose testimony would have been cumulative, collateral, or would have unfairly surprised state. *Id.*

At trial, appellant did not identify the witness, gave no justification for the lack of endorsement nor did he make an offer of proof. On appeal, appellant now identifies the witness as his mother. We cannot say that the prejudice to the state could have been removed or ameliorated or that the trial court's refusal to permit rebuttal witnesses in this case was fundamentally unfair to the appellant. Under the circumstances, we do not find the trial court abused its discretion. Appellant's subpoint is without merit.

 In his second point, appellant contends that the trial court erred in overruling his motion to suppress his November 19 statement to Arnett and plainly erred in admitting said statement at trial in that appellant told Arnett that he "wouldn't make any statement at that time" but Arnett persisted to interrogate appellant and testified that appellant responded suspiciously. Appellant's point is directed to the admission of his statement after viewing the videotape of "that must be my twin." Appellant contends that Arnett was required to stop his interrogation after appellant said he "wouldn't make any statements at that time" but instead, Arnett improperly placed appellant beside the video image and said there was no doubt but that he was the robber, techniques of persuasion that are the functional equivalents of interrogation.

 We note that while appellant challenged the admission of the statement "that must be my twin" in pre-trial motions, Arnett's testimony regarding the statement was admitted without objection at trial. Absent a showing of plain error, appellant's failure to object results in the point not being preserved for appeal. Appellant urges us to engage in plain error review. Plain error review is limited to determining whether there was error affecting substantial rights that resulted in manifest injustice or a miscarriage of justice. *State v. Qualls*, 810 S.W.2d 649, 651 (Mo.App.1991).

 The United States Supreme Court in *Michigan v. Mosley*, examining the question of the admissibility of inculpatory custodial statements, stated that questioning a suspect after he invokes the right to remain silent is

not a *per se* violation of the suspect's *Miranda* rights. *State v. Grant*, 784 S.W.2d 831 (Mo.App.1990), citing *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The resolution of the issue turns on whether the suspect's right "to cut off questioning" has been "scrupulously honored." *Grant*, 784 S.W.2d at 839.

■ In *Mosley*, the court relied on three factors to find the defendant's right to remain silent was scrupulously honored: (1) the interrogation immediately ceased when the defendant said he did not want to talk anymore; (2) there was a significant passage of time between the invocation of the right to remain silent and the second interrogation, and fresh set of *Miranda* warnings preceded the resumption: and (3) the renewed interrogation related to a different crime. *Id.* The mere fact the subsequent interrogation is about the same crime does not compel the conclusion the suspect's right to cut off questioning was not scrupulously honored. *Id.* However, if the second interrogation does concern the same subject matter as the first, the purpose behind reinitiating interrogation cannot be to wear down the suspect or convince him to change his mind. *Id.*

In *State v. Fuente*, 871 S.W.2d 438, 441 (Mo.banc 1994), our Supreme Court reviewed a trial court's judgment where the trial court admitted some of defendant's incriminating statements to police and our Western District reversed the judgment due to the officer's failure to "scrupulously honor" the defendant's fifth amendment right to silence. Our Court, affirming the trial court's judgment, stated:

> We find no manifest injustice in the trial court having overruled Fuente's motion to suppress the statements in that patrol car. To be manifest injustice, the error and injustice resulting therefrom must be apparent. An error is only an injustice if it is prejudicial. Here, the alleged error is not apparent, because it is not clear that the detention of Fuente had risen to the level of custody plus interrogation. (Citation omitted). Furthermore, even if the evidence was clearly inadmissible, it is not apparent that its admission was prejudicial because there was ample other evidence

for the trial court to find Fuente guilty of possession of marijuana. Therefore, there is no way Fuente could have been prejudiced by the admission of these statements. *Id.* at 443.

Here, although a review of the record indicates that Arnett failed to scrupulously honor appellant's right to silence under the *Mosley* standard, the admission of appellant's statement "that must be my twin" was not prejudicial because there was ample other evidence for the jury to find appellant guilty of the crimes which he was charged with: Meyers' identification of appellant; appellant's January 26, 1995 statement to Arnett; Arnett's identification of appellant on the videotape; and the videotape itself. Thus, the admission of appellant's statement under these circumstances does not rise to the level of manifest injustice. Point denied.

In his third point, appellant contends that the motion court erred in overruling his Rule 29.15 Motion because a review of the record leaves the definite and firm impression that post-conviction counsel rendered ineffective assistance in that they failed to act as reasonably competent attorneys when they relied solely on the testimony of appellant to prove the claims that trial counsel was ineffective in failing to call certain witnesses.

■ Appellant essentially argues that we should remand for a Rule 29.15 hearing based on ineffective counsel. However, it is well-settled that a claim for ineffective post-conviction counsel is not cognizable under Rule 29.15. *Pollard v. State*, 807 S.W.2d 498, 502 (Mo.banc 1991). We decline appellant's request to reconsider that rule. Point denied.

JUDGMENT AFFIRMED.

ROBERT G. DOWD, Jr., P.J. and HOFF, J., concur.