**STATE of Missouri, Respondent,**

v.

**Lorne BIVINES, Appellant.**

**No. WD 65811.**

Missouri Court of Appeals, Western District.

Sept. 11, 2007.

Margaret Mueller Johnston, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Dora A. Fichter, Assistant Atty. Gen., Jefferson City, MO, joins on the briefs for Respondent.

Before RONALD R. HOLLIGER, P.J., HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

Lorne Bivines was charged with five counts of burglary in the second degree and three counts of stealing. The jury acquitted Bivines of four counts of burglary and two counts of stealing. The jury found him guilty of one count of burglary in the second degree and one count of stealing. He appeals the convictions. The judgment is affirmed.

## Background

This appeal arises from five burglaries that occurred in Richmond, Missouri, in September of 2004. The burglaries occurred at two businesses and three schools, one of which was the Elkhorn Elementary School. Acting on a tip, police interviewed Andrew James Floyd. Floyd, who was 17 at the time, was residing with his grandparents. Floyd's friend, Bivines, was also residing with Floyd's grandparents and was Floyd's roommate. Original-

ly, Floyd denied involvement in the burglaries. Next, in a written confession, he admitted that he had committed the burglaries, but said specifically (in response to questions) that Bivines, his roommate, was not involved. Finally, he changed his position again and stated that he and Bivines had committed the burglaries together. Floyd agreed to plead guilty and to provide testimony at Bivines' trial in order to obtain consideration for a favorable sentence.

The police searched the bedroom used by Floyd and Bivines and found bank bags for the Elkhorn school, two sets of gloves, ski masks, a Polaroid camera from the Elkhorn School, and a surveillance tape from the Elkhorn School security camera.

At trial, two officers, Garry Bush and John Davis, testified that they had viewed the surveillance tape from the school. The tape later had malfunctioned, and the crime lab was unable to get it to work again. Appellant Bivines conceded that the tape could not be viewed at trial. Over defense objection, Officers Bush and Davis each testified that he could identify Bivines from the tape. Each one said he had prior dealings with Bivines (of an unspecified nature) in the past and were familiar with him. Officer Davis had taken some photographs from the tape by pausing the tape and taking shots of the screen while it was paused. These photos were also introduced into evidence. The photos, which are of poor quality, reveal two figures, one of which appears Caucasian and one of which appears African–American, walking in the school hallway. The figures both appear to be of medium build, but it is very hard from the still photographs to distinguish any facial features. The Afri-

can–American male appeared to have a scarf over part of his face.

On cross-examination, both officers admitted that they had suspected Bivines was involved before they watched the tape, and so were probably more inclined to identify him. Officer Davis also admitted that, in his report after watching the tape, he had identified Floyd (a Caucasian) as one male depicted on the tape, but had stated only that the other male on the tape was an African–American male. He admitted that stating the identity of Bivines in his report would have been an important thing to do. He had no explanation for why he had not done so.

After a few hours of jury deliberations, the jury indicated to the court that it was deadlocked on only two counts, the counts involving the Elkhorn School. In response, the court gave the jury the "hammer instruction," MAI–CR 3d 312.10.[1] After another hour, the jury returned with its verdict.

The jury found Bivines not guilty of all counts of burglary and stealing except those involving the Elkhorn School. The jury found Bivines guilty of one count of second-degree burglary and one count of stealing as to the charges involving the Elkhorn School. Bivines appeals.

### Standard of Review

■ Bivines' sole point on appeal concerns the testimony of Officers Bush and Davis about the Elkhorn Elementary School surveillance tape. Bivines claims that the officers should not have been allowed to testify that they could identify him as the person on the tape. He claims that this invaded the province of the jury to decide ultimate facts. Ordinarily a trial

---

1. This instruction urges the jury to break the deadlock and to try to come to a verdict if possible.

court's admission of the testimony of a lay witness is reviewed for an abuse of the court's discretion. *State v. Winston*, 959 S.W.2d 874, 877 (Mo.App.1997).

■ At trial, when Bivines objected to the officers' testimony, he did so on the basis of the "best evidence rule." He claimed that the tape was the best evidence of the identity of the person on the tape and so the officers' testimony should not be admitted in lieu of the tape. The court ruled that the tape was not available because it no longer functioned properly enough for the jury to view it. Thus, the court ruled that the officers' testimony was admissible despite Bivines' best evidence objection.

■ "To preserve an objection to evidence for appellate review, the objection must be specific, and the point raised on appeal must be based upon the same theory." *State v. Boydston*, 198 S.W.3d 671, 674 (Mo.App.2006). The purpose is to give the trial court an opportunity to correctly rule on the issue in light of the proper objection. *See id.* A litigant is not permitted on appeal to rely on a theory different from the one offered at trial. *State v. Phillips*, 939 S.W.2d 502, 505 (Mo.App. 1997). Because Bivines is arguing a different theory now than he was before the trial court, his claim is not preserved.

■ He requests, however, that we exercise our discretion to review his claim for "plain error" under Rule 30.20. Rule 30.20 states that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain error review is to be used sparingly and does not justify a review of every error that was not properly preserved. *Phillips*, 939 S.W.2d at 505–06. It is "limited to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice." *State v. Vanlue*, 216 S.W.3d 729, 733 (Mo.App.2007). "Claims of plain error are reviewed 'under a two-prong standard.'" *Id.* First, this court looks to whether the claim facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice occurred. *Boydston*, 198 S.W.3d at 675. If such grounds exist, we then determine whether manifest injustice or a miscarriage of justice actually occurred. *Id.* The defendant seeking relief on grounds of plain error bears the burden of showing not only plain, obvious error but also that a manifest injustice or a miscarriage of justice occurred. *See Vanlue*, 216 S.W.3d at 734.

## Analysis

■ Bivines argues that the evidence linking him to the crimes with which he was charged, other than the officers' relatively weak testimony, was the testimony of Floyd, an admitted perpetrator, who agreed to testify in return for a favorable sentence consideration. The physical evidence found in the bedroom Bivines shared with Floyd was not uniquely tied to Bivines through fingerprints or any other means. Bivines argues that since the jury acquitted him of all charges *except* the ones involving the Elkhorn School, the jury obviously rejected Floyd's credibility. Thus, he argues, the *officers'* identification testimony was essential to his conviction of the counts related to the school burglary. Bivines argues that since the officers' testimony invaded the province of the jury, it should not have been admitted; and because it had a major impact on the jury's verdict, he argues, the ruling permitting the testimony was plainly erroneous and resulted in a manifest injustice.

■ Generally speaking, lay witnesses are not permitted to give opinion

testimony about a matter in dispute. *Winston*, 959 S.W.2d at 877. A lay witness is a witness who does not possess "scientific, technical or other specialized knowledge." [2] The jury ordinarily can form an accurate opinion on its own without the help of the witness. *Id.* However, a lay witness may provide an opinion when the lay witness possesses knowledge that is not available to the jury and that would be helpful to the jury in determining an issue in dispute. *Id.* In the context of identification, the witness's identification testimony is admissible if there is a basis for concluding that the witness had a specific opportunity to observe something so as to make it more likely that he can correctly make an identification than the jury can. *Id.* at 877–78.

This issue arose in *State v. Gardner*, 955 S.W.2d 819 (Mo.App.1997). There, a man entered a gas station and held it up with a knife. *Id.* at 821. An officer retrieved a surveillance tape from the gas station and viewed it. *Id.* The officer recognized the defendant on the tape, having known him for approximately ten years. *Id.* at 822. Over the defendant's objections, the officer was allowed to testify at trial that the man on the tape was the defendant. *Id.* On appeal, the court held that the officer's testimony was admissible because the quality of the tape was poor and the defendant's arm obscured part of his face, making it difficult for the jury to adequately identify him. *Id.* at 825. Also, the court held that the officer's testimony was sufficiently probative to outweigh the danger of unfair prejudice because he was familiar with the defendant, having known him for ten years. *Id.*

The court revisited this issue in *State v. Winston*, 959 S.W.2d 874 (Mo.App.1997). In that case the defendant was charged with three burglaries. *Id.* at 876. Two of the burglaries occurred at an auto repair shop. *Id.* at 876–77. A surveillance tape was produced from the first burglary of the auto repair shop. *Id.* at 877. At trial, the defendant's girlfriend's sister was allowed to identify him from a print generated from the surveillance tape. *Id.* On appeal, the court held that because the sister had spent time with the defendant immediately surrounding the burglaries and was familiar with his features, and because the print was not entirely clear, it was not error for the court to allow her testimony. *Id.* at 878.

Bivines relies primarily on *State v. Presberry*, 128 S.W.3d 80 (Mo.App.2003). In that case, two people were robbed at an ATM machine, but neither was sure of the identity of the robber. *Id.* at 87. A surveillance tape from the ATM of one of the robberies was shown at trial, as well as some still photographs that were taken from the surveillance tape. *Id.* at 88. Two officers who had reviewed the tape testified at trial that the defendant was the man depicted in the tape. *Id.* at 89. The court, noting that the identity of the perpetrator was difficult to determine from the tape and photographs, and noting that neither officer had any prior familiarity with the defendant, concluded that it was plainly erroneous to allow admission of their identification testimony. The court concluded that it invaded the province of the jury to present such testimony. The court found the evidence prejudicial in that there was no other identification evidence linking the defendant to the crime. Neither of the

---

**2.** Section 490.065, the statute dealing with expert witness testimony, relates to the testimony of witnesses having "scientific, technical or other specialized knowledge" that may assist the jury. The testimony of the officers in this case is not within these parameters. This is ordinary identification testimony. The only difference is that the jury could not see for itself the videotape that the officers observed.

victims could say with assurance that the defendant was the man who robbed them. *Id.*

Here, unlike in *Presberry*, both officers had prior dealings with Bivines. They testified that the tape was more "clear" than the photographs, which were relatively blurry. The State argues that, in such an instance, it could not invade the province of the jury to admit the testimony. We agree that a trial court could reasonably believe such testimony could assist the jury and that it would not invade the province of the jury to decide the facts. The jury here was not able to view the surveillance tape because it was not available. There were photographs taken of the surveillance tape that were available to the jury and that the jury saw. The officers testified that the videotape was "more clear" than the pictures taken from the videotape. The majority of the photos were taken with a Polaroid camera from the screen while the tape was paused. One of the photos was taken in the same manner, but with a different 35 millimeter camera.

Two things were established to the jury: (1) Andrew Floyd was involved with the burglaries; and (2) Floyd had an African–American accomplice in the Elkhorn School burglary. It was not as clear to the jury that there was more than one person involved in the *other* burglaries, because there was no security videotape or other evidence to that effect. The videotape had been available only as to the Elkhorn School burglary. The question for the jury was whether *Bivines* was the accomplice in the Elkhorn School burglary, as opposed to someone else. The State had three witnesses whom the jury could believe (though their credibility was subject to question) to the effect that Bivines was the accomplice at the Elkhorn School. One was Floyd (Bivines' friend and alleged co-participant), and other two were officers who said they could identify Bivines from the tape.

Bivines' trial counsel attacked not only Floyd's credibility but also that of the officers. On cross-examination, both officers candidly admitted that they had already suspected Bivines was involved before Floyd implicated him. Officer Davis, who prepared the report, admitted that he had failed to identify Bivines in the report after viewing the tape. He had identified only Floyd and had noted only that Floyd was accompanied by an African–American male. He admitted that it would have been important to identify Bivines in his report. He had no explanation for why he had not done so. Nevertheless, Davis also, along with Bush, maintained that, due to familiarity with Bivines, upon viewing the videotape, he could identify Bivines in the videotape.

There is no challenge here to the sufficiency of the evidence. The issue is whether the court committed plain error in failing, *sua sponte*, to exclude the testimony of the officers on the basis that it invaded the province of the jury. We cannot say that it was plain and obvious that the officers' testimony invaded the province of the jury. While such testimony should be received only with caution and defense counsel should be allowed great latitude in cross-examination, the trial court did not commit plain, obvious error in allowing the testimony of the officers. We affirm the judgment of convictions.

LOWENSTEIN and HOLLIGER, JJ., concur.