**STATE of Missouri, Plaintiff–Respondent,**

v.

**Kevin R. CALICOTTE, Defendant–Appellant.**

No. 24318.

Missouri Court of Appeals, Southern District, Division Two.

July 3, 2002.

*Revenue, State of Mo. v. Gaertner,* 32 S.W.3d 564, 565 (Mo. banc 2000).

Craig A. Johnston, Asst. Public Defender, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., for Respondent.

JAMES K. PREWITT, Judge.

Following a jury trial in Pulaski County, Kevin R. Calicotte ("Defendant") was convicted of felony attempted stealing in violation of § 564.011, RSMo Supp.1998, and sentenced to four years' imprisonment. Defendant appeals his conviction and sentence, contending that the trial court erred in overruling his motion for judgment of acquittal at the close of all evidence and in sentencing him for a felony because the evidence failed to establish beyond a reasonable doubt that the property he at-

tempted to steal had a market value of $750 or more.

Defendant worked as a driver for Elrod Truck Service ("Elrod" when referring to the business or its owner, Thomas Elrod), which transports grain and operates out of Rolla, Missouri. Elrod's trucks are leased to TGC Corporation ("TGC"), which is based in Illinois, to haul brewer's grain out of Anheuser–Busch Brewery ("Anheuser–Busch") in St. Louis. Essentially, Elrod provides the tractor, driver, and fuel and maintenance for the tractor, and TGC provides the trailer.

The brewer's grain transported from Anheuser–Busch is purchased by Commodity Specialist Company ("CSC"), which in turn sells it to dairy farmers for use as cattle feed. Thus, during transport of the grain, CSC owns the grain, and TGC acts as bailee and has legal responsibility and control of the grain until it reaches the delivery point. The vast majority of the grain is transported and delivered directly to farmers or others who purchase the grain from CSC, but some of it is transported to reload pads, which CSC has located in different parts of Missouri. A reload pad is a facility that enables CSC to distribute grain to smaller farmers who are unable to handle a full semi-trailer load of the grain. These farmers bring vehicles into the reload pad and are then able to pick up smaller volume loads of the grain.

One reload pad is located in Macomb, Missouri, and it was to this reload pad that Defendant was scheduled to deliver a load of brewer's grain on April 10, 1999. He was given specific directions on the route from Anheuser–Busch to the site in Macomb, and he did not have permission to take the grain anywhere else. The evidence indicated that Defendant loaded his truck with 24.14 tons of brewer's grain at Anheuser–Busch between 12:30 and 12:45

p.m. on that day, stopped in St. James at 2:15 p.m. and then went "off-duty."

Sometime between 10:30 and 11:00 p.m. Ronald Dishman, who worked for Dishman Towing and Recovery, was notified that Defendant had called for assistance with an overturned truck. Dishman responded to a place in Maries County around midnight and found the tractor trailer lying on its side. Dishman also noticed grain on the ground that had been in the truck and another pile of grain closer to a shed. Once he realized that Defendant was not the owner of the truck, that it belonged to Elrod, Dishman informed Defendant that the owner would need to be contacted before Dishman could proceed.

Defendant did not want to call Elrod, but said he would do so when Dishman threatened to leave. Defendant went inside, telling Dishman that he had called Elrod, but after waiting until nearly 1:00 a.m., Dishman told Defendant he needed to call Elrod again. This time, Dishman was present when Defendant made the call. Elrod testified that he only received one phone call from Defendant that night.

Defendant explained to Elrod and Dishman that the truck overturned while he was attempting to work on an air leak. Defendant claimed it was necessary to raise the truck bed in order to work on the leak, but Dishman testified that such action would not be necessary. Defendant also told Dishman that he had been at the back of the truck when it overturned.

When Elrod arrived at the scene, Defendant left a few minutes later, claiming he needed to take something to his wife or girlfriend. Defendant did not return that night or the next day. Elrod determined it would be best to contact the Sheriff's Office and arranged to meet Dishman back at the scene around 10:00 a.m. on April 11th to "right" the truck.

When Dishman returned at that time, he was able to tell that there was damage to the interior of the tractor, specifically that the windshield was broken and knocked out and the steering wheel bent. Part of the process of righting the truck involved supplying the trailer with air, which could not be accomplished if there had been an air leak. Dishman experienced no difficulty with the air system; there were no leaks in either the tractor or the trailer.

There was evidence indicating that the grain had been dumped out of the back of the truck and the lever in the cab that operated the hydraulic pump was in the raised position, which meant it was in a position to raise the bed on the trailer. In addition, the release mechanism on the tailgate was in the open position. Approximately one-half of the truck's load of grain had already been dumped before the truck had overturned.

The load of grain was delivered to the Macomb reload pad on April 11th or 12th and was 5.09 tons short of the original weight of 24.14 tons picked up at Anheuser–Busch. The 5.09 tons were never recovered.

Following an investigation by the Maries County Sheriff's Office, Defendant was charged with the class D felony, in violation of §§ 564.011, for the attempted stealing of grain with a value of more than $750. Venue was transferred to Phelps County and then later to Pulaski County following the grant of a mistrial.

Defendant filed a motion for acquittal at the close of all evidence, which was denied by the trial court. The jury found Defendant guilty of attempted felony stealing, a class D felony, and sentenced him to four years' imprisonment.

Defendant's sole point on appeal challenges the sufficiency of the evidence of his conviction. Specifically, he argues that the trial court erred in overruling his motion for judgment of acquittal at the close of all evidence because the evidence was insufficient to support a conviction for attempted felony stealing. He further argues that the evidence failed to establish beyond a reasonable doubt that the brewer's grain had a market value of at least $750 in Maries County, because the State used a figure of $41.50 per ton to reach the felony amount. Defendant contends it was inappropriate for the State to use $41.50 per ton because that was the retail price for the grain that was sold from the reload pad in Macomb, which was not proved to be the market value in Maries County.[1]

Defendant argues that the replacement value was shown to be $28.72 per ton, which would have yielded a total amount for the 24.14 tons of $693.30, which is an amount that falls below the felony amount of $750. In addition, Defendant argues that since 24.14 tons was the weight of the load when the grain was wet, it would have weighed less when resold; thus, he contends that he should not have been charged with attempted stealing of the total amount. Further, he argues that the State did not prove that he intended to steal the entire trailer load of grain.

 "In order for a defendant to be entitled to a directed verdict of acquittal, there must be insufficient evidence from which a reasonable person could have found the defendant guilty as charged." *State v. Merchant,* 871 S.W.2d 102, 104 (Mo.App.1994). In determining the sufficiency of the evidence, this court views the

---

1. Although no where in the record is it stated that Macomb is in a different county, specifically Wright County, both parties refer to this fact in their briefs and we take judicial notice of the geographical fact that Macomb is in Wright County. *See State v. Berger,* 618 S.W.2d 215, 218 (Mo.App.1981).

evidence and all reasonable inferences in the light most favorable to the verdict and disregards any evidence or inferences to the contrary. *State v. Hall*, 56 S.W.3d 475, 478 (Mo.App.2001). We afford the jury deference and do not act as a "super juror" that may veto the jury's result. *Id.* Our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror could find Defendant guilty beyond a reasonable doubt. *Id.*

We address Defendant's latter arguments first. Defendant contends that 24.14 tons was an inappropriate weight to use to calculate the market value of the grain of which Defendant was charged of attempting to steal because that was the weight when the grain was wet. There was testimony presented that brewer's grain is received from Anheuser–Busch and transported wet. The trailers in which the grain is transported have drip pans underneath to collect the moisture that may seep from the grain.

However, there was no testimony that the product is re-weighed before being delivered to farmers or that a farmer receiving a full semi-trailer load of grain would be charged for anything other than the amount of tons that were loaded and weighed in St. Louis. Defendant's argument has no merit.

Defendant also argues that 24.14 tons was an inappropriate amount to use to calculate the market value of the grain because there was insufficient evidence that he intended to steal the entire amount. However, there was testimony presented that one-half of the grain had already been dumped by the time the truck overturned, and that the levers and mechanisms necessary to release the grain from the trailer were set in the open or on position. There was also ample testimony presented to show that Defendant's statements at the scene that the truck overturned while he was fixing an air leak were false. There was sufficient evidence presented under which the jury could have believed that he intended to steal the entire load of grain; thus, his argument is without merit.

His remaining argument addresses the market value of the grain. Attempted stealing of property valued at or above $750 is a class D felony under § 564.011.3(3), RSMo Supp.1998. *See also* § 570.030.3(1). Under § 570.030.7, RSMo Supp.1998, stealing property valued under $750 is a class A misdemeanor; therefore, attempted stealing of property valued under $750 would be classified as a class C misdemeanor under § 564.011.3(5), RSMo Supp.1998. Section 558.011 authorizes a term of imprisonment not to exceed five years upon conviction for a class D felony and a term not to exceed fifteen days upon conviction for a class C misdemeanor. Thus, the value of the property stolen determines that severity of the crime of stealing. *Hagan v. State*, 836 S.W.2d 459, 462 (Mo.banc 1992). The burden is on the State to prove value beyond a reasonable doubt. *Woolford v. State*, 58 S.W.3d 87, 89 (Mo.App.2001). Absent substantial evidence as to the value, "an essential element of the felony stealing charge is not proved." *Id.*

Section 570.020 defines value as "the market value of the property at the time and place of the crime." The statute further states that "if such cannot be satisfactorily ascertained, [market value is] the cost of replacement of the property within a reasonable time after the crime." § 570.020(1). In the circumstance where "the value of property cannot be satisfactorily ascertained ..., its value shall be deemed to be an amount less than one

hundred fifty dollars." § 570.020(3), RSMo Supp.1998.

■ "[T]here are various methods available to prove the market value of stolen property." *State v. Morgan*, 807 S.W.2d 209, 210 (Mo.App.1991). "It is without question that purchase price is relevant to the determination of market value." *State v. Beebe*, 736 S.W.2d 525, 527 (Mo.App. 1987). Evidence of the retail price can be utilized in establishing the value of stolen property, although "proof of market value by retail price is sufficient only when, ... we are dealing with items which are sold over the counter on a more or less daily basis." *Morgan*, 807 S.W.2d at 210. In certain cases, both retail price and wholesale cost are relevant in determining fair market value. *State v. Williams*, 916 S.W.2d 465, 466 (Mo.App.1996).

Evidence presented at trial regarding the value of the grain with which Defendant was charged of attempting to steal included that the grain was sold by Anheuser–Busch to CSC for $13.56 per ton, which would yield a total purchase cost for CSC of $327.34 for the 24.14 tons. CSC sold the grain to farmers from the reload pad in Macomb for $41.50 per ton, which would result in a total price of $1001.81 if someone purchased 24.14 tons. For the 5.09 tons that were never recovered, TGC paid CSC $146.19, which would calculate to $28.72 per ton.[2]

There was also testimony regarding the transportation costs that TGC charges CSC to haul the grain from Anheuser–Busch to its delivery destination. TGC charges based on mileage and would charge CSC $14.72 per ton to transport to the reload pad in Macomb and $9.67 per ton to deliver to Maries County. Elrod testified that the mileage from Anheuser–Busch to the Macomb reload pad is 197 miles and a TGC representative estimated that the mileage from Anheuser–Busch to the farm in Maries County where the truck was located is 110 miles. If Defendant had taken the route prescribed by Elrod from Anheuser–Busch to Macomb, we take judicial notice that the two destinations would be approximately 90 miles apart. *See State v. Berger*, 618 S.W.2d 215, 218 (Mo.App.1981).[3]

■ Neither party cites, and our research did not discover, a Missouri case that turns on the issue of whether the valuation was appropriate, given the time and place that was used for determining market value. However, under § 570.020(1), RSMo Supp.1998, it is essential that market value be determined based on "the time and place of the crime." Cases from other states have discussed the issue, and we find the language in some of those persuasive and useful in our review.

One case from Kansas and one from Oklahoma used the analogy that since the market price for cattle in Garden City, Kansas was largely driven or governed by the market price at Kansas City, Missouri, and that was the best information available, it was appropriate to use the Kansas City price as evidence of the market price. *See Hoffman v. State*, 24 Okla.Crim. 236, 218 P. 176, 179 (1923); *Evans v. Moseley*, 84 Kan. 322, 114 P. 374, 377 (1911). In another Kansas case, the court determined that evaluating market value of geese in Topeka was appropriate, rather than calcu-

2. The record shows $146.18 in one place and $146.19 in another; the difference does not change the calculation of the amount per ton.

3. The directions Elrod provided to Defendant for the trip from Anheuser–Busch to Macomb included taking Interstate 44 west, Highway 63 south, then Highway 60 west to the Macomb exit. Maries County is just north of Interstate 44 at the Highway 63 south exit.

lating market value for the geese on the farm from which they were stolen, because the farm adjoined the city of Topeka. *See State v. Coffey,* 145 Kan. 253, 65 P.2d 253, 254 (1937).

*Hoffman* also establishes a rule that "[i]f the evidence of value at the place of the [stealing] is not clear and explicit, such evidence of value at other places sufficiently near and in like situation may be received as will reasonably tend to establish a fair value." *Hoffman,* 218 P. at 179. A California case fashioned a "reasonable" test as well, where the court noted "that the place which determines the market value of stolen property, for the purposes of fixing the degree of the crime, is necessarily somewhat flexible and uncertain in extent, and that in defining its radius, the character of the property, the stability and uniformity of its price, and the circumstances of the particular case, should be considered." *People v. Siderius,* 29 Cal. App.2d 361, 84 P.2d 545, 550 (1938).

■ The only evidence presented by the State was of the retail price from the Macomb reload pad. Under the circumstances of the case, it was inappropriate for the State to use that price ($41.50 per ton, which led to a total retail price for 24.14 tons of $1001.81). There was no evidence presented that a farmer in Maries County would purchase the grain at that price. In fact there was evidence that would lead to a conclusion that a farmer in Maries County would pay significantly less. This is based on the fact, as shown above, that the two destinations were nearly 90 miles apart, and the testimony that the transportation cost per ton for delivery to Maries County is significantly less than that for delivery to the reload pad in Macomb ($14.72 per ton for Macomb and $9.67 per ton for Maries County). It seems reasonable to assume that CSC would charge farmers in Maries County

less for the grain, since the transportation costs are less.

Since no evidence was presented of the market value at the time and place of the crime and we determine that the use of retail price from Macomb was inappropriate, the statute instructs us to use replacement value. § 570.020(1), RSMo Supp. 1998. The only evidence presented regarding replacement value was that TGC paid CSC $28.72 per ton for the 5.09 tons that were never recovered. That would lead to a market value of $693.30 for the entire load of grain, a market value less than $750. Defendant also presented evidence of wholesale price, the price that CSC paid Anheuser–Busch per ton. That amount was $13.56 per ton, or a total of $327.34, also below the $750 threshold for a felony conviction.

■ "To convict a defendant of a criminal offense, the State is required, as a matter of due process, to prove beyond a reasonable doubt each and every element of the offense charged." *Hall,* 56 S.W.3d at 478. The State did not meet its burden.

We reverse Defendant's felony conviction for attempted stealing and remand to the trial court to enter judgment of conviction for the class C misdemeanor of attempted stealing and for resentencing on that conviction. *See State v. Carroll,* 41 S.W.3d 878, 882 (Mo.banc 2001).

PARRISH, J., and RAHMEYER, J., concur.