

# In the Missouri Court of Appeals
## Eastern District
### DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED100244 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | |
| | ) | Honorable Jon A. Cunningham |
| DEMETRIUS A. BROWN, | ) | |
| | ) | |
| Appellant. | ) | Filed: November 18, 2014 |

The defendant, Demetrius A. Brown, appeals the judgment and sentence entered by the Circuit Court of St. Charles County following his conviction by a jury of two counts of second-degree burglary, in violation of section 569.170 RSMo. (2000), and two counts of class-C felony stealing, in violation of section 570.030.3 RSMo. (Supp. 2010).[1] The trial court sentenced the defendant as a prior and persistent offender to a total of twenty years of imprisonment.

Because the State failed to make a submissible case on count six—second-degree burglary of the sacristy of St. Peter Catholic Church—we reverse the defendant's conviction on that count. Because the State failed to prove a value of $500 or more at the time of the offense for the television that the State charged the defendant with stealing in count seven, we amend the defendant's conviction on count seven to the lesser-included offense of class-A misdemeanor stealing pursuant to section 570.030.8 RSMo. (Supp. 2010) and remand this count to the trial court for re-sentencing.

---

[1] All statutory references are to RSMo. (2000) except as otherwise indicated.

We affirm the defendant's other two convictions: second-degree burglary of the rectory at St. Peter Catholic Church charged in count one, and stealing a credit card from St. Peter's charged in count two.

## Facts

Viewed in the light most favorable to the judgment, the facts are as follows. On June 11th, 2011, Don Moxley, the business manager for St. Peter Catholic Church in St. Charles, Missouri, reported to police that a television was missing from the chapel.[2] The television was a 32-inch Samsung, model number LN32A450, donated by a parishioner who had bought it in June 2008 for $749.99. One day before Mr. Moxley reported the television stolen, the defendant sold that same Samsung television to a pawn shop in St. Louis for $140.

On Saturday, June 18th, 2011, at approximately 9:00 a.m., Jennifer Lanteigne, a teacher at St. Peter School and a member of St. Peter Catholic Church, was praying in the chapel at the church. She heard someone enter and pace back and forth, and then she heard a loud rattling noise. She turned and saw the defendant in the hall outside the chapel, near the prayer candles and the candle-donation box. She did not recognize the defendant, and became concerned when she heard further pacing and rattling. She deliberately jangled her keys to indicate that she was leaving, and she left through the chapel's front door. Ms. Lanteigne saw a white car occupied by a younger man parked next to her green minivan. She noticed that the white car had damage to the side rear, and she did not recall seeing a license plate. Ms. Lanteigne saw the defendant walk out the front door of the main church, and get into the white car.

Ms. Lanteigne drove next door to St. Peter's rectory, which housed the priests' residence and the church business offices, and told Father Fred Meyer what she had seen. Ms. Lanteigne

---

[2] Although Mr. Moxley reported the theft of the television on June 11th, 2011, the television may have been stolen as early as June 9th, 2011 with the theft going unnoticed.

and Father Meyer walked to the chapel hallway where Ms. Lanteigne had seen the defendant. They found that the wooden donation box for the prayer candles had been forced open, and contained no money.

Father Meyer returned to the rectory while Ms. Lanteigne left St. Peter's church complex. As she drove by St. Peter's school, however, Ms. Lanteigne saw the same white car in the school parking lot located directly behind the rectory. She saw the defendant carrying a black case and walking quickly from the rectory toward the white car. Ms. Lanteigne immediately returned to the rectory to check on the elderly Father Meyer. Father Meyer contacted Mr. Moxley, who called the police. Father Meyer discovered that a heavy outside door at the back of the rectory, normally kept locked and used only by the housekeeper, was partially open. Church personnel discovered that a laptop computer, a laptop case, a camera, cash, and a Lowe's credit card had been taken from the rectory, and that, in addition to the candle-donation box having been emptied, a set of keys for both the church and the rectory were missing from the sacristy.

On June 21st, 2011, Carol Breckle, the director of religious education at St. Robert Bellarmine Catholic Church in St. Charles, was at the church when she received a call from the parish secretary saying that a man sought to enter the building, and that he matched the description of the man who had broken into St. Peter's. Ms. Breckle saw the defendant try to open a set of locked side doors. He then got into a white car with body damage and no license plates and drove to another part of the building. Ms. Breckle went to warn the maintenance man, Dave, what was happening, and heard the lid closing on the donation box in the hallway for the St. Vincent DePaul Society. She investigated, and saw the defendant standing near the donation box. The defendant told Ms. Breckle that Dave was right outside and had let him in, and the defendant then went into the church. Ms. Breckle followed the defendant, and watched him go

3

quickly and directly to the front of the church and look in the candle-donation box. The defendant then went around the tabernacle, where the church keeps the communion host, and Ms. Breckle at that point insisted that the defendant leave immediately through the nearest doors.

On July 2nd, 2011, Officer Kenneth Mayer of the St. Charles Police Department noticed a white Ford Taurus with extensive body damage on its left rear side that matched the description of a car sought by police. Two men were inside the car. Officer Mayer followed the car, and pulled the car over when it entered a gas station. Officer Mayer spoke with the car's driver, the defendant, and arrested him. In the white Taurus, police found among other items a white dress shirt and keys belonging to St. Peter's, marked "rectory" and "church basement."

Detective Sergeant David Kleinschmidt of the St. Charles Police Department investigated the burglary at St. Peter's. During his investigation, Detective Kleinschmidt obtained surveillance video from St. Robert's, which showed the white car that Ms. Breckle saw along with footage of the defendant. Detective Kleinschmidt interviewed the defendant on July 2nd, 2011. At the time of his interview, the defendant wore a white dress shirt with the sleeves unbuttoned. The defendant told Detective Kleinschmidt that he was from St. Louis, and often went to a Baptist church. The defendant explained that sometimes, however, he would go to a church and put money in the donation box for prayer candles because he had recently received bad medical news. He said that it had been a month or so since he had been to St. Charles, and that he had been to two Catholic churches there. Detective Kleinschmidt told the defendant that a woman had seen him at St. Peter's. The defendant acknowledged that he had seen the woman, that she saw him leave, that she herself left, and that she drove a green van. The defendant stated that he did not steal any candles or anything. He finally admitted that he had been inside St.

4

Peter's on June 18th, 2011 while his passenger stayed in the car. The defendant confirmed that he was in the surveillance footage from St. Robert's and that he was driving the white car.

Detective Kleinschmidt checked an internet database containing participating pawn-shop transactions nationwide. He determined that only one Samsung television of the same model as that reported stolen from St. Peter's had been sold to a pawn shop in the metropolitan St. Louis area between June 9th and June 11th, 2011. The defendant was listed as the person who sold the television involved in that transaction. Detective Kleinschmidt noted that the signature on the pawn ticket looked similar to the defendant's signature on his *Miranda* waiver form. Detective Kleinschmidt also obtained surveillance footage from two of the three Lowe's stores where the credit card stolen from St. Peter's was used. Detective Kleinschmidt identified the defendant as the man in the videos wearing a white dress shirt with the sleeves unbuttoned and using the stolen credit card.

The State ultimately charged the defendant by substitute information with two counts of burglary in the second degree—count one for St. Peter's rectory and count six for St. Peter's sacristy; three counts of felony stealing—count two for the credit card, count three for the laptop computer, and count seven for the television; and two counts of misdemeanor stealing—count four for the camera and count five for the cash. All counts related to incidents occurring at St. Peter Catholic Church, and charged the defendant as "acting in concert with another." The State did not charge the defendant with any offense related to St. Robert's.

The defendant filed a motion in limine seeking to exclude, *inter alia*, evidence that he entered St. Robert's and approached the church's donation box. The trial court sustained the motion in part, and denied it in part. The court allowed the State to adduce evidence that the defendant allegedly tried to break into the donation box at St. Robert's on June 21st, 2011.

5

A number of witnesses testified at trial, including Ms. Breckle from St. Robert's, and the State entered numerous exhibits into evidence. Among these exhibits were surveillance videos from St. Robert's and from Lowe's showing footage of the defendant. At trial Detective Kleinschmidt testified that the man seen on the Lowe's videos was the defendant. The defendant objected to this testimony. In its closing argument, the State told the jury, "Then about a week later he's pulling the same stunt at St. Robert. . . . He goes at St. Peter's from the candle box to the sacristy to the rectory without stopping anywhere in between and at St. Robert he goes from the poor box to the candle donation box."

The jury convicted the defendant on count one (burglary of St. Peter's rectory), count two (stealing the credit card), count six (burglary of St. Peter's sacristy), and count seven (stealing the Samsung television). The jury acquitted the defendant on count four (stealing the camera) and count five (stealing cash from St. Peter's). The trial court declared a mistrial on count three (stealing the laptop) when the jury could not reach a verdict. The trial court sentenced the defendant as a prior and persistent offender to terms of imprisonment of 15 years each for counts one, two, and six, all to run concurrently, and to a consecutive term of five years for count seven. The defendant appeals.

## Discussion

In five points on appeal, the defendant challenges the sufficiency of the evidence to support his conviction for second-degree burglary of St. Peter's sacristy; the sufficiency of the evidence to support his conviction for stealing property (the television) valued at $500 or more; submission of the verdict-directing instruction for stealing property valued at $500 or more (the television); the trial court's admission of evidence of conduct at St. Robert's with which the

6

defendant was not charged; and the trial court's admission of Detective Kleinschmidt's testimony identifying the defendant on the Lowe's surveillance videotape.

### Sufficiency of the Evidence to Support the Defendant's Conviction For Burglary of the St. Peter Catholic Church Sacristy

The defendant claims the trial court erred in overruling his motion for judgment of acquittal and in entering judgment and sentence on count six—second-degree burglary of St. Peter's sacristy—because the evidence was not sufficient to show that either the defendant or an accomplice knowingly entered the church sacristy unlawfully. Specifically, he argues that the State failed to prove any reason the defendant or an accomplice would have known that the sacristy of the church was not open to the public.

We review the denial of a motion for judgment of acquittal to determine if the State adduced sufficient evidence to make a submissible case. *State v. Pullum*, 281 S.W.3d 912, 915 (Mo. App. E.D. 2009). Our role is to determine whether sufficient evidence was produced at trial so that a reasonable person could conclude that the defendant was guilty. *Id.* "In determining whether the evidence is sufficient to support a conviction, we view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, and we disregard all contradictory evidence and inferences." *Id.* We must consider the inferences favorable to the State unless the contrary inference is such that it would necessarily give rise to a reasonable doubt in the mind of a reasonable juror. *State v. Grim*, 854 S.W.2d 403, 413 (Mo. banc 1993). We may not supply missing evidence, or give the State the benefit of unreasonable, speculative, or forced inferences. *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001).

A person commits the crime of second-degree burglary, a class-C felony "when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable

7

structure for the purpose of committing a crime therein." Section 569.170. With respect to his conduct or to attendant circumstances, a person acts knowingly or with knowledge when he is aware of his conduct or that those circumstances exist. Section 562.016.3.

> [A] person "enters unlawfully or remains unlawfully" in or upon premises when he is not licensed or privileged to do so. A person who, regardless of his purpose, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or by other authorized person. A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public.

Section 569.010(8).

The central question here is whether the State adduced sufficient evidence to allow the jury to determine beyond a reasonable doubt that the defendant or an accomplice knowingly entered unlawfully—that is *knowingly* entered without a license or privilege to do so—a part of St. Peter Catholic Church that was not open to the public, namely the sacristy. As section 562.016.3 states, for the defendant or an accomplice to have knowingly entered the sacristy unlawfully, he must have been aware that his entry into the sacristy was unlawful because it was not open to the public. We conclude that the State failed to adduce sufficient evidence to support the defendant's conviction of second-degree burglary charged in count six.

Father Meyer testified at trial that the sacristy is where the church keeps the priests' vestments, the chalices, and the wine and host for mass. It is also where the collections from the masses are kept in a safe until retrieved by one of the priests for accounting. The prosecutor asked Father Meyer, "And in fact to get at it [the sacristy] *from the church* you have to go through the altar, right?" (Emphasis added.) In direct response, Father Meyer explained that to reach the sacristy one has to enter the sanctuary and walk to the front into the altar area. Father

8

Meyer explained that the sacristy is generally not open to the public, but only to a few people who participate in the church service, such as the priests, the children who serve, the reader, and the singer. He added that a person may come to the sacristy, however, if he or she wishes to speak to a priest or one of the other service participants.

During Ms. Lanteigne's testimony, the State introduced a series of five photographs as exhibits 22, 24, 25, 26, and 27. Ms. Lanteigne identified the photographs as depicting (1) the chapel, the church with its steeple, and the parking lot [Exhibit 22]; (2) "the sacristy or the back of the church," the rectory, and the school principal's parking space [Exhibit 24]; (3) the principal's parking space [Exhibit 25]; (4) the entrance to the sacristy of the church [Exhibit 26]; and (5) the front of the rectory showing the front door and the area in which Ms. Lanteigne parked [Exhibit 27]. These five exhibits have been filed with this Court. The photographs in this series of exhibits all depict the exterior of the church complex, including an exterior door identified as the entrance to the sacristy. The photograph of the exterior door to the sacristy shows no sign indicating that it is a private entrance.

In addition, Father Meyer viewed Exhibit 24, an exterior photograph of the back of the church, and identified the sacristy for the jury. Soon thereafter on re-cross examination, defense counsel asked "[i]s the sacristy itself locked?" Father Meyer replied "[m]ost times, yes. Except this was a Saturday and Saturday most times the sacristy—the *inside* door is always open, the inside is always open, but on Saturdays, for weddings and things like that, it generally would be open, yeah." (Emphasis added.) The evidence reveals that there were at least two doors to the sacristy—an interior door from the altar area and an exterior door from a rear parking area. Father Meyer testified that "the inside door is always open." The exterior door may have been closed, but the State adduced no evidence that it was locked on the Saturday in question. We

9

cannot determine from the evidence in the record how the defendant or an accomplice achieved entry into the sacristy. We conclude the evidence is insufficient to establish that the defendant or an accomplice knowingly unlawfully entered the sacristy.

We have considered Exhibits 22 and 24 through 27, Ms. Lanteigne's descriptive testimony of those exhibits, and Father Meyer's testimony that the *inside* door to the sacristy is always open and that on Saturdays the sacristy generally would be open. This evidence creates a contrary inference unfavorable to the State that is such a natural and logical extension of the evidence that a reasonable juror could not disregard it: that the defendant or an accomplice could have entered the sacristy through an unlocked, unmarked, possibly open door, either interior or exterior, without knowing that the door led to a private room in the church. *Grim*, 854 S.W.2d at 411.

The State contends that by walking into the altar area, as one must to reach the sacristy "from the church," the defendant must have known that the sacristy was a room that was not open to the public. We reject the State's argument. We conclude from the evidence that the defendant or an accomplice may have entered the sacristy either through an unlocked unmarked exterior door or through an unmarked open interior doorway between the sacristy and the sanctuary. Whichever the manner of entry, we cannot conclude that the defendant or an accomplice was on notice that such entry in and of itself would be illegal.

If the defendant or an accomplice entered the sacristy through the interior door, the evidence is insufficient to establish that the defendant or an accomplice "knowingly entered unlawfully" a private room. The State introduced no testimony or exhibits to explain the sanctuary layout; the layout of the altar area; the position of the interior sacristy door in relation to the altar; or the position of the altar in relation to the sanctuary, whether at the far front or

10

more centrally located. The State introduced no exhibits or testimony to explain whether the altar area and the interior door to the sacristy were set off from the public sanctuary by a railing, steps, or similar boundary. It may indeed be disrespectful or even sacrilegious to walk through the altar area when one is not a service participant, but disrespect or sacrilege does not equate to a knowing unlawful entry from a public area into a private area under the Missouri criminal code. Furthermore, Father Meyer testified that the interior door was "always open." He did not say "unlocked"; he said "open." If the defendant or an accomplice entered the sacristy through the exterior door, the evidence is likewise insufficient to establish that the defendant or an accomplice "knowingly entered unlawfully" a private room. The State adduced no evidence that either the interior or exterior sacristy door had a sign that stated "private," "no admittance," "authorized personnel only," or anything of that nature that would inform a person that the door led to a private area rather than to a public area, such as a prayer room or a hallway from the interior door or to a hallway or the sanctuary from the exterior door. We may not supply missing evidence, or give the State the benefit of unreasonable, speculative, or forced inferences. *Whalen*, 49 S.W.3d at 184. A reasonable juror who considered the evidence presented could not find beyond a reasonable doubt that the defendant or an accomplice entered a private room in a building open to the public, *knowing* that such entry in and of itself was unlawful.

The State acknowledges in its brief that a sacristy door was unmarked. Nonetheless, the State continues that no reasonable probability exists that "one might find restrooms or another public portion of the church behind the unmarked door where the clergy prepare for mass." The State's argument assumes that one knows before entering that the unmarked unlocked sacristy doors lead to a private room where the priests and other service participants prepare for mass.

11

In *State v. Weide*, the defendant was convicted of second-degree burglary for unlawfully entering the kitchen of a restaurant. 775 S.W.2d 255, 255-56 (Mo. App. W.D. 1989). In that case, the Court rejected the State's argument that it established the defendant unlawfully entered the kitchen because restaurant employees testified that only employees were allowed in the kitchen. *Id.* at 258. The Court observed that "no visible signs indicated that the restaurant prohibited public entry through the swinging door or even indicated what was behind the door."[3] *Id.* The Court held that proof that the defendant had an unlawful purpose to commit assault did not establish that he knew he would have to make an unlawful entry to achieve his purpose. *Id.*

Likewise here, proof that the defendant or an accomplice had the unlawful purpose to steal does not establish that he knew he would have to make an unlawful entry into the private sacristy to achieve that purpose. The theft of the church keys from the sacristy by the defendant or an accomplice, without more, does not establish beyond a reasonable doubt his knowledge that his entry beyond an unmarked unlocked sacristy door that may have been standing open, whether via the sanctuary or the parking lot, was in and of itself unlawful.

The State failed to establish, as a necessary element of second-degree burglary, that the defendant or an accomplice "knowingly entered unlawfully" the sacristy of St. Peter Catholic Church. For us to find there was sufficient evidence adduced that the defendant or an accomplice "knowingly entered unlawfully" St. Peter's sacristy would require us to supply missing evidence or to give the State the benefit of unreasonable, speculative, or forced

---

[3] The Western District reviewed the *Weide* case under the old circumstantial-evidence rule. "When the state relies on circumstantial evidence to secure a conviction, 'the facts and circumstances on which the state relies must be consistent with guilt and inconsistent with any reasonable theory of innocence, and they must exclude every reasonable hypothesis of the defendant's innocence.'" *Weide*, 775 S.W.2d at 258 (quoting *State v. Prier*, 634 S.W.2d 197, 199 (Mo. banc 1982)). The Supreme Court rejected this rule, both as a jury instruction and as an appellate standard of review, in *State v. Grim.* 854 S.W.2d at 408. "Under any interpretation of the quantum of evidence required by the circumstantial evidence rule, the rule is no longer valid. It should be, and is, rejected." *Id.*

12

inferences. Therefore, the defendant's conviction for this offense cannot stand, and we grant his claim of error. We reverse the trial court's judgment on count six, second-degree burglary of St. Peter's sacristy, and vacate the defendant's conviction on that count.

*Sufficiency of the Evidence to Support the Defendant's Conviction*
*For Stealing Property (a Television) Valued at $500 or More*

The defendant claims that the trial court erred in overruling his motion for judgment of acquittal and entering judgment and sentence for the class-C felony of stealing the television charged in count seven. The defendant argues that the State presented evidence that the television was worth $749.99 in June 2008, but that the State failed to prove that it had a value of $500 or more at the time of the charged stealing in June 2011. The defendant points to the sale of the television to the pawn shop for $140 in June 2011.

We review the denial of a motion for judgment of acquittal to determine if the State adduced sufficient evidence to make a submissible case. *Pullum*, 281 S.W.3d at 915. Our role is to determine whether sufficient evidence was produced at trial so that a reasonable person could conclude that the defendant was guilty. *Id.* "In determining whether the evidence is sufficient to support a conviction, we view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, and we disregard all contradictory evidence and inferences." *Id.*

To convict a defendant of a criminal offense, the State must prove beyond a reasonable doubt each and every element of the charged offense. *State v. Ecford*, 239 S.W.3d 125, 127 (Mo. App. E.D. 2007). In count seven, the State charged the defendant with stealing property valued at $500 or more, namely a television belonging to St. Peter Catholic Church, in violation of section 570.030 RSMo. (Supp. 2010).

13

"A person commits the crime of stealing if he or she appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." Section 570.030.1 RSMo. (Supp. 2010). Any offense in which the value of the property is an element is a class-C felony if the value of the property appropriated is $500 or more but less than $25,000. Section 570.030.3(1) RSMo. (Supp. 2010). The State bears the burden of proving the value of stolen property beyond a reasonable doubt. *State v. Calicotte*, 78 S.W.3d 790, 794 (Mo. App. S.D. 2002). Absent substantial evidence of the property's value, an essential element of the felony stealing charge goes unproved. *Id.*

Section 570.020(1) RSMo. (Supp. 2013) provides in pertinent part that "[e]xcept as otherwise specified in this section, 'value' means the *market value of the property at the time and place of the crime*, or if such cannot be satisfactorily ascertained, the cost of replacement of the property within a reasonable time after the crime." (Emphasis added). "When the value of property cannot be satisfactorily ascertained pursuant to the standards set forth in subdivisions (1) and (2) [pertaining to certain written instruments] of this section, its value shall be deemed to be an amount less than five hundred dollars." Section 570.020(3) RSMo. (Supp. 2013). Any violation of section 570.030 for which no other penalty is specified in this section constitutes a class-A misdemeanor. Section 570.030.8 RSMo. (Supp. 2010).

At trial, the State adduced evidence that a parishioner purchased the Samsung television for $749.99 in June 2008, that it was in like-new condition when the parishioner donated it to St. Peter's, that Mr. Moxley discovered it stolen in June 2011, and that the defendant sold the television to a pawn shop for $140.

The defendant acknowledges that the Missouri Supreme Court stated in *State v. Napper* that "[t]he rule seems to be that, where the property is secondhand, . . . , proof as to its cost and

14

its length of use may be put before the jury, and that constitutes evidence of value sufficient to support a finding." 381 S.W2d 789, 791 (Mo. 1964)(quoting *State v. Breese*, 33 S.W.2d 919, 921 (Mo. 1930)). The defendant contends, however, that section 570.020, which went into effect in 1979 some 15 years after the *Napper* decision, abrogates that opinion. He acknowledges that appellate courts have applied the rule stated in *Napper* even after the enactment of section 570.020, but argues that none of the appellate opinions actually considered the effect that the definition of "value" contained in section 570.020(1) had on *Napper*'s holding.

Since becoming effective in 1979, section 570.020(1) has defined "value" in relevant part to mean "the market value of the property at the time and place of the crime, or if such cannot be satisfactorily ascertained, the cost of replacement of the property within a reasonable time after the crime."[4] Missouri law had no comparable provision prior to enactment of this section. Mo. Ann. Stat. section 570.020 cmt. 1973 Proposed Code (West 1999).

> Problems of valuation in the area of theft offenses [were] continuing and vexing. This section [570.020] sets out reasonably clear standards for ascertaining value. Generally, fair market value at the time and place of the crime is the standard. If fair market value cannot be satisfactorily determined, replacement cost within a reasonable period after the offense is to be used.

*Id.* In general, the comments that accompany a uniform code when adopted carry great weight in construing the code. *Ecford*, 239 S.W.3d at 128. We agree with the defendant that section 570.020 RSMo. (Supp. 2013) abrogates the rule stated in *Napper*, which is an example of the

---

[4] This definition of value contained in section 570.020(1) has remained unchanged since its original enactment. In 2002, section 570.020(1) was amended to add language providing that if the victim is a merchant and the property is a type the merchant sells in the ordinary course of business, then the value shall be the price for which the merchant would normally sell the property. H.B. 2120, sec. A, 91st Gen. Assem., 2d Reg. Sess. (Mo. 2002). That provision does not apply here. In addition, the major revisions made to the criminal code in 2014, and taking effect in 2017, have left unchanged the definition of "value" contained in section 570.020(1) as "the market value of the property at the time and place of the crime." S.B. 491, 97th Gen. Assem., 2d Reg. Sess. (Mo. 2014).

15

"continuing and vexing" valuation problems that existed prior to enactment of section 570.020 and that the legislature intended section 570.020 to address.

The State cites *State v. Slocum* wherein this Court repeated the rule identified in *Napper* that "[e]vidence of the purchase price and age of a stolen item are sufficient to establish value under Section 570.020." 420 S.W.3d 685, 687 (Mo. App. E.D. 2014). After citing this proposition, however, the Court did not apply it in deciding *Slocum*. *Id.* Rather, the *Slocum* opinion proceeded to summarize the evidence of the value of the stolen property according to the testimony of the owner: that the stolen property was a handmade custom mandolin crafted by one of the best mandolin makers in the country, if not the world; that it was owned by a professional musician who played it on tour worldwide; that the value of this type of Eastern European mandolin appreciates over time; and that the owner believed the mandolin to be worth around $6,000 at the time of the theft. *Id.* The *Slocum* opinion indicates that the mandolin was about 13 years old at the time of its theft, but is silent as to its purchase price. *Id.* Ultimately, *Slocum* relied on a different rule—that the owner may testify to an item's value at the time of the crime—to determine that the State adduced sufficient evidence of value. *Id.* at 687-88.

It is well-established that an owner's opinion can constitute substantial evidence of an item's worth. *State v. Reilly*, 674 S.W.2d 530, 533 (Mo. banc 1984); *see also State v. Isgriggs*, 300 S.W.3d 553, 556 (Mo. App. S.D. 2009)(testimony of company co-owner established total value of stolen items in excess of $4,000); *State v. Weekley*, 92 S.W.3d 327, 333 (Mo. App. S.D. 2002)(owner's valuation of stolen property sufficient to submit issue to jury); *State v. King*, 988 S.W.2d 663, 666 (Mo. App. E.D.1999)(property owner may testify to property's value, and jury determines weight and sufficiency of such testimony); *State v. Roderick*, 828 S.W.2d 729, 732 (Mo. App. E.D. 1992)(owner's opinion of value of stolen goods suffices to take issue to jury).

16

We do not contend that *Slocum* reached an incorrect result. Given the owner's testimony of the value of the property at the time of the crime presented in that case, it was decided correctly. However, *Slocum* should not be cited for its reference to an old proposition of law that has been abrogated by statute and that *Slocum* itself did not apply, namely that "[e]vidence of the purchase price and age of a stolen item are sufficient to establish value under Section 570.020."

Here, the only evidence of the television's value was that it had been purchased new for $749.99 in June 2008, and that the defendant sold the television to a pawn shop for $140 in June 2011. The State adduced no evidence that the market value of the television at the time and place of the crime was $500 or more. The State did not adduce any evidence that the market value of the television could not be ascertained, nor did the State adduce evidence of the television's replacement value near the time of the crime.

Absent substantial evidence of the property's value, the State leaves an essential element of the felony stealing charge unproved. *Calicotte*, 78 S.W.3d at 794. Furthermore, "[w]hen the value of property cannot be satisfactorily ascertained pursuant to the standards set forth in subdivisions (1) and (2) [pertaining to certain written instruments] of this section, its value shall be deemed to be an amount less than five hundred dollars." Section 570.020(3) RSMo. (Supp. 2013). The State failed to adduce sufficient evidence of the television's value to support the defendant's conviction for class-C felony stealing of property valued at $500 or more pursuant to section 570.030.3(1) RSMo. (Supp. 2010).

However, the evidence that the defendant stole the television—aside from its value—was overwhelming. The defendant sold to a St. Louis pawn shop a television identical to the one stolen from St. Peter's within a day of the theft. A police search of an internet database containing participating pawn-shop transactions nationwide revealed only one such sale of a

17

Samsung television of the model in question in the St. Louis metropolitan area between June 9th and June 11th, 2011. The defendant was the seller in that transaction. And the signature on the pawn ticket substantially matched the defendant's signature on his *Miranda* waiver form, according to a layperson's opinion.

The record lacks sufficient evidence to sustain a conviction for felony stealing under section 570.030.3 RSMo. (Supp. 2010) because the State failed to prove the market value of the television at the time of the theft. Accordingly, we must overturn the defendant's conviction for felony stealing. Where the conviction of a greater offense has been overturned for insufficient evidence, however, this Court may enter a conviction on the lesser-included offense if the evidence was sufficient for the jury to find each element of the lesser-included offense and the jury was required to find those elements in reaching the verdict on the greater offense. *Ecford*, 239 S.W.3d at 129.

Class-A misdemeanor stealing is a lesser-included offense of felony stealing. *Id.* Section 570.030.8 RSMo. (Supp. 2010) provides that "[a]ny violation of this section for which no other penalty is specified in this section is a class A misdemeanor." In reaching its verdict in this case, the jury found each element necessary to support a conviction for misdemeanor stealing: that the defendant appropriated the property of another without consent with the purpose of depriving the owner of that property. Section 570.030.1 RSMo. (Supp. 2010). As we have already summarized, the State presented sufficient evidence to establish the elements of misdemeanor stealing.

We reverse the defendant's conviction of class-C felony stealing on count seven, enter a conviction on the lesser-included offense of class-A misdemeanor stealing on that count, and remand for resentencing.

18

*The Verdict Director for Count Seven, Stealing the Television*

The defendant claims the trial court plainly erred in submitting to the jury instruction number 11, the verdict director for count seven, stealing the television. The defendant maintains that this instruction did not inform the jury that the term "value" as used in the instruction refers to the market value of the property at the time and place of the crime. He argues that the jury might have wrongly defined this term for itself as the value of the property at the time it was purchased, resulting in a manifest injustice.

Given our disposition of the defendant's claim of error about his conviction for felony stealing charged in count seven, we deny as moot the defendant's claim of plain error regarding the verdict director for that count.

*Admission of Other Incidents of Misconduct*

The defendant claims the trial court abused its discretion in admitting Ms. Breckle's testimony and the surveillance photos from St. Robert's and in allowing the State to refer to this evidence in its opening statement and closing argument. The defendant argues that this evidence of other bad acts constituted improper propensity evidence that the State presented only to suggest to the jury that if the defendant was the person who walked into St. Robert's, then he must have been the person to steal from St. Peter Catholic Church.

"The 'well-established general rule' concerning the admission of evidence of prior criminal acts 'is that proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial.'" *State v. Vorhees*, 248 S.W.3d 585, 587 (Mo. banc 2008) (quoting *State v. Reese*, 274 S.W.2d 304, 307 (Mo. banc 1954)). Evidence of other crimes or misconduct is not admissible for the purpose of showing the defendant's criminal character or

19

propensity to commit crimes. *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011); *State v. Young*, 367 S.W.3d 641, 645 (Mo. App. E.D. 2012). Courts that follow the common-law tradition almost unanimously disallow the prosecution's resort to any kind of evidence of a defendant's evil character to establish a probability of his guilt. *Old Chief v. United States*, 519 U.S. 172, 181 (1997).

An exception to the general rule exists, however, where the evidence of other crimes or misconduct is both logically and legally relevant. *Young*, 367 S.W.3d at 645. Evidence of other misconduct is logically relevant when it has some legitimate tendency to directly establish the defendant's guilt of the charges for which he is on trial. *Id.* Evidence of other misconduct is legally relevant when its probative value outweighs its prejudicial effect. *Id.*

Evidence has a legitimate tendency to prove the specific crime charged when the State uses it to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing commission of two or more crimes so related to each other that proof of one tends to establish the other, or the identity of the person charged with commission of the crime on trial. *Id.* These exceptions are not exhaustive, and the trial court may admit evidence of other misconduct even if the evidence does not fall within an enumerated exception so long as it is both logically and legally relevant. *Id.* For example, the trial court may admit evidence of other crimes that helps present a complete and coherent picture of the events that transpired. *Id.*

A finding of logical and legal relevance, however, will never provide a basis for the admission of evidence of prior crimes for purposes of demonstrating a defendant's propensity. *State v. Moore*, 352 S.W.3d 392, 402 (Mo. App. E.D. 2011). The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some admittedly relevant evidence to entice the factfinder to declare guilt on a ground apart from proof specific to the offense charged. *Old*

20

*Chief,* 519 U.S. at 180. "Although . . . 'propensity evidence' is relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance." *Id.* at 181 (quoting *United States v. Moccia,* 681 F.2d 61, 63 (1st Cir. 1982)). Propensity evidence is unconstitutional because it "violates [the] defendant's right to be tried for the offense for which he is indicted." *Vorhees,* 248 S.W.3d at 591 (quoting *State v. Sladek,* 835 S.W.2d 308, 311 (Mo. banc 1992)).

The defendant contends that the State improperly introduced evidence of his actions at St. Robert's when he was charged only with crimes relating to St. Peter's, and when his visit to St. Robert's occurred several days after his last alleged trip to St. Peter's. Accordingly, he maintains, the two incidents constituted different acts that were not part of a common scheme. He further argues that the St. Robert's evidence was highly prejudicial because the State in its closing argument used this evidence to assert that if he was the person who went to St. Robert's, he likewise must have been the person who unlawfully entered and stole from St. Peter's.

The State counters that the defendant's argument "is without merit because strictly speaking, no evidence of bad acts was admitted at trial." The State argues that while perhaps suspicious under the circumstances, the acts at St. Robert's "were not themselves bad acts and therefore should not have been barred as such." This argument has no merit. The State essentially concedes as much when it proceeds to argue that, to the extent the jury could infer that the defendant engaged in bad acts at St. Robert's, the evidence was admissible because it showed the defendant's intent. The defendant's intent was an issue, the State continues, because both St. Peter's and St. Robert's are public places where the defendant could have had a

21

legitimate reason to visit, but the evidence from St. Robert's showed that the defendant did not act in a manner consistent with someone visiting the church for an honest reason.

The admission of Ms. Breckle's testimony and the surveillance photos from St. Robert's under these circumstances constitutes error. We agree with the defendant that the St. Robert's evidence was unduly prejudicial because the State adduced it purely as propensity evidence to assert that if the defendant was the person who went to St. Robert's, he likewise must have been the person who unlawfully entered and stole from St. Peter's.

"Nevertheless, the trial court's error in admitting the disputed evidence does not constitute reversible error unless the defendant can show that he was prejudiced, or that a reasonable probability exists that the verdict would have been different absent the court's error." *Moore*, 352 S.W.3d at 404. The test for prejudice in criminal cases involving improper admission of evidence is whether the improper admission was outcome-determinative. *Id.* A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all properly admitted evidence, a reasonable probability exists that the jury would have acquitted the defendant but for the erroneously admitted evidence. *Id.*

Here, the properly admitted evidence against the defendant for the burglary of St. Peter's rectory and the stealing of the credit card and television was overwhelming.[5] The defendant admitted that he was at St. Peter's on the day of the second theft, and that he saw Ms. Lanteigne and her green minivan. Ms. Lanteigne testified that she heard the prayer-candle donation box being handled while the defendant was in its immediate area. A search of the church and rectory

---

[5] As discussed previously, while the evidence of the then-current *value* of the television stolen from St. Peter's was not sufficient to convict the defendant of felony stealing as opposed to misdemeanor stealing, the evidence was overwhelming that he did, in fact, steal the television from St. Peter's.

a short time after the defendant's visit revealed that the prayer-candle donation box had been forcibly opened and was empty of cash. A set of keys for the rectory was missing, and police later found the keys in the white car the defendant was driving at the time of his arrest. In addition, surveillance videos showed a man identified as the defendant using the Lowe's credit card stolen from St. Peter's rectory. The back door to the rectory was normally locked, yet it was discovered partially open immediately after Ms. Lanteigne saw the defendant at that location carrying a black case from the rectory.

Furthermore, the evidence revealed that the defendant sold a Samsung 32-inch television that matched the model stolen from St. Peter's within the time frame of the first stealing incident. And albeit adduced as a lay opinion, the signature on the pawn ticket substantially matched the signature the defendant provided to police when signing the waiver form for his *Miranda* rights. Although the trial court abused its discretion in admitting the evidence from St. Robert's because it was adduced for no purpose other than to demonstrate the defendant's propensity to enter and steal from churches, we conclude that the defendant was not prejudiced as a result, given the overwhelming evidence of the defendant's guilt of the burglary of St. Peter's rectory and the stealing of the Lowe's credit card and the television.

At this juncture, we feel obliged to again admonish the State. In *State v. Moore*, we concluded that the improper admission of extensive and repeated propensity evidence concerning the defendant's driving record—when the defendant had already conceded his guilt on the only count for which his driving record was even arguably relevant—warranted reversal and remand for a new trial on all counts because the evidence on the more serious counts was "far from overwhelming." *Id.* at 403-04. In *Moore*, we admonished this very same assistant prosecutor about his brazen use of propensity evidence in arguing that "[i]t is time when we deal with this

23

defendant to move beyond passing out traffic tickets because he's moved beyond that[,]" and "[Y]ou need to find him guilty of everything else, too . . . ." *Id.* We stated then that "we do not find that the prosecutor drifted a bit too close to the cliff's edge [the precipice of reversible error identified in *State v. Perry*].[6] Rather, we conclude that the prosecutor flung himself headfirst into the abyss." *Id.* at 404. Ignoring our prior admonition, this same assistant prosecutor, Philip Groenweghe, has again flung himself headfirst into the abyss. It should not happen again.

Nonetheless, under the circumstances here, the evidence is overwhelming of the defendant's burglary of St. Peter's rectory as charged in count one, and his stealing of the credit card and the television from St. Peter's as charged in counts two and seven, respectively. Given the properly admitted evidence, the defendant has failed to demonstrate that the outcome of the trial on these counts would have been different without the improper admission of evidence related to his entry into St. Robert's. Thus, we deny the defendant's claim of error as to the St. Robert's evidence.

### Admission of Testimony Identifying the Defendant
### On the Lowe's Surveillance Tape

The defendant claims the trial court abused its discretion in allowing Detective Kleinschmidt to testify that the defendant was the person appearing on the Lowe's surveillance videos. He argues that Detective Kleinschmidt's testimony constituted improper opinion evidence on a matter in dispute, based on facts the jury was equally capable of evaluating, and thus invaded the province of the jury.

---

[6] 689 S.W.2d 123, 126 (Mo. App. W.D. 1985).

The State introduced into evidence two separate surveillance videos from Lowe's accompanied by Detective Kleinschmidt's testimony.[7] The defendant preserved this claim of error when he objected to Detective Kleinschmidt's identification of him from any of the Lowe's surveillance videos.

A trial court has broad discretion to admit or exclude evidence. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). The court abuses its discretion when its ruling is clearly against the logic of the circumstances, and is so unreasonable as to indicate a lack of careful consideration. *Id.* We will reverse only when the error so prejudiced the defendant that it deprived him of a fair trial. *Id.* at 223-24. Trial-court error is prejudicial only if a reasonable probability exists that the error affected the outcome of the trial. *Id.* at 224.

In general, a lay witness may not give opinion testimony about a matter in dispute. *State v. Bivines*, 231 S.W.3d 889, 892-93 (Mo. App. W.D. 2007). A lay witness is one who does not possess technical, scientific, or other specialized knowledge. *Id.* at 893. Ordinarily, a jury can form an accurate opinion on its own without the assistance of the lay witness. *Id.* When the lay witness's opinion is based on knowledge not available to the jury and would be helpful to the jury in reaching its own opinion or determining a matter in dispute, however, the lay witness may provide an opinion. *Id.* A lay witness's identification testimony is admissible if there is a basis

---

[7] The State argues that the defendant objected only to Detective Kleinschmidt's identification in one of the two videos, and that the failure to object regarding the second video identification failed to preserve the claim of error, allowing us to review only for plain error. Our review of the transcript indicates that the defendant objected to Detective Kleinschmidt's identification of him from any and all of the surveillance videos. While it might have been better practice to object to admission of any of the surveillance videos and then to object to Detective Kleinschmidt's identification of the defendant in each one, we find it sufficiently clear that the defendant objected to Detective Kleinschmidt's identification based solely on what the State claims are good videos that the jury could, and did, view.

for concluding that the witness had a specific opportunity to observe something that makes it more likely that the witness, rather than the jury, can correctly make an identification. *Id.*

Here, the only evidence that Detective Kleinschmidt's opinion was based on knowledge not available to the jury was his testimony that he spent significant time talking to the defendant in person. Thus, Detective Kleinschmidt had the opportunity to observe the defendant's mannerisms and how he wore his clothes, in particular his habit of wearing white dress shirts with the sleeves unbuttoned. Assuming *arguendo* that this "special" knowledge did not render Detective Kleinschmidt's identification testimony admissible, the defendant nonetheless must show that he suffered prejudice by admission of the identification testimony in order to warrant reversal.

The defendant asserts that the present situation is similar to that of *State v. Presberry*, 128 S.W.3d 80 (Mo. App. E.D. 2003). In *Presberry*, this Court held that the admission of testimony from two police officers identifying the person in a surveillance video as the defendant constituted plain error where neither officer had prior familiarity with the defendant. *Id.* at 86-87. On that basis, the present case is similar to *Presberry*. We held, however, that the error was prejudicial in *Presberry* "given the limited other evidence used to convict Defendant." *Id.* at 90. In that case, the police officers provided the only identification testimony, and no evidence linked the defendant to the charged offenses except that his jacket at the time of his arrest looked similar to the jacket the suspect wore in the surveillance video and photos. *Id.*

In contrast in this case, considerable evidence linked the defendant to the offenses. The defendant admitted he was at St. Peter's on June 18th, 2011. Ms. Lanteigne saw and identified him, and the prayer-candle donation box was found torn open within minutes of Ms. Lanteigne's sighting of the defendant in that immediate area of the church. The defendant sold a television to

26

a pawn shop identical to the one stolen from St. Peter's within a day of the theft. He also had the keys taken from St. Peter's sacristy in the car that he was driving when police arrested him, and that car matched Ms. Lanteigne's description of the car she saw with the defendant at St. Peter's. In addition, the jury saw the surveillance video clips, saw the defendant in person at trial, and could make its own decision. Consequently, the defendant did not suffer prejudice when the trial court permitted Detective Kleinschmidt's testimony, and we deny this point.

## Conclusion

Because the State failed to make a submissible case on count six, we reverse the trial court's judgment on this count and vacate the defendant's conviction for second-degree burglary of the sacristy of St. Peter Catholic Church.

Because the State failed to prove a value of $500 or more at the time of the offense for the television that the State charged the defendant with stealing in count seven, we amend the defendant's conviction on count seven to the lesser-included offense of class-A misdemeanor stealing, in accordance with sections 570.020(3) RSMo. (Supp. 2013) and 570.030.8 RSMo. (Supp. 2010). We remand this count to the trial court for re-sentencing consistent with this opinion.

Finally, we affirm the defendant's other two convictions: second-degree burglary of the rectory at St. Peter Catholic Church charged in count one, and stealing a credit card from St. Peter's charged in count two.

_____
LAWRENCE E. MOONEY, JUDGE

GLENN A. NORTON, J., concurs.
CLIFFORD H. AHRENS, P.J., concurring in part and dissenting in part in separate opinion.

27



# In the Missouri Court of Appeals
## Eastern District

DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED100244 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the St. Charles County |
| vs. | ) | |
| | ) | |
| DEMETRIUS A. BROWN, | ) | Hon. Jon A. Cunningham |
| | ) | |
| Appellant. | ) | FILED: November 18, 2014 |

### OPINION CONCURRING IN PART AND DISSENTING IN PART

I respectfully dissent from the majority opinion's holding as to Count VI, burglary in the second degree, and would affirm the judgment of the trial court on that count. I concur with the majority opinion in all other respects.

Fr. Meyer testified at trial that the sacristy in a church is where the priests' vestments, the chalices, the wine and the host are kept for mass. It is open only to a few people who are needed for a service. He stated that the sacristy is not open to the public, and that to get to the sacristy one has to go up into the sanctuary and into the altar area. It has a door that is normally locked, except on Saturdays when there are weddings or other ceremonies. Various marked keys were kept in a drawer in a counter in the sacristy, which included the keys found in the driver's side door of the white car operated by the defendant.

Defendant argues that Fr. Meyer's testimony that the sacristy is not open to the public is "conclusory" and that there were insufficient facts to prove that he or an accomplice would have

known this, especially given that there was no evidence that there were any "no trespassing" signs or other signs to indicate that the sacristy was not open to the public. The case law on which Defendant relies does not require that there must be signs posted stating "No Trespassing" or "Employees Only" whenever a building has both public and private areas. Rather, they have held, in effect, it may or may not be evident that an area is open to the public depending on the circumstances of the particular case. State v. Weide, 775 S.W.2d 255 (Mo. App. 1989), did not say that people might not know that a restaurant kitchen is not open to the public, but rather that it was not obvious that the door led to the restaurant kitchen; it was a reasonable possibility that a person, even while committing another felony, might find a restroom or another public portion of the restaurant behind the unmarked door.

In the present case, ordinary reasonable people would know that in a church, Catholic or otherwise, the area behind the church altar is not open to the public, but is rather supposed to be used by the clergy and by those assisting the clergy. At oral argument, the defendant's appellate counsel conceded that it was a reasonable inference that the sacristy door was closed at the time of the theft. There is no plausible reason why the defendant, who was not a member of St. Peter's and apparently not even Catholic, and was at St. Peter's at a day and time when it was normally empty, would traverse the sanctuary, go through the altar area to a closed, apparently unmarked door, and expect that the room beyond was open to the public. Unlike Weide, there is no reasonable possibility that there was a public restroom or any other room open to the general public behind the altar through a closed door.

A church is a building that is partly open to the public with areas, such as the sacristy, that are not open to the public. The sacristy of a church is not a parking garage generally open to the public, nor is it generally located in an area that reasonable people would think is open to the

2

public at large rather than just clergy and their assistants. Unlike the situation in State v. Richie, 376 S.W.3d 58 (Mo. App. 2012), there was no sign positively indicating that the sacristy was open to the public.

The majority places great emphasis that there apparently is a second, exterior door to the sacristy that is unmarked, and which may have been unlocked at the time of the burglary, and that the evidence fails to establish how the defendant or an accomplice entered the sacristy, whether through the interior door or the exterior door. Accordingly, the majority concludes that the State failed to show that the defendant or an accomplice knowingly unlawfully entered the sacristy. We note that the defendant did not raise this two-door theory either at trial or anywhere in his brief as part of his point relied on or his supporting argument, or during oral argument before this Court, and the State had no opportunity to address this theory. However, even given this theory, there was still sufficient circumstantial evidence to support the defendant's conviction. Regarding the exterior door, the testimony indicates that it is at the rear of the church, and the photos admitted into evidence appear to confirm this. There is no sign identifying it as an entrance to the church. It is at the rear of the church, presumably as far away as could be possible from the main public entrance. No reasonable person would believe that an unmarked door at the rear of a church, far away from the main public entrance, would be open to the general public.

The majority's holding would require all businesses and institutions that have space that is partially open to the public to post "Authorized Personnel Only" signs or the equivalent over every entrance to a non-public space that a person could access easily through a space open to the public, such as an unmarked storeroom that is behind a sales counter, or any exterior door such as the rear kitchen door in a restaurant or a stage door to a theater. There was sufficient

3

circumstantial evidence to support the defendant's conviction for burglary in the second degree on Count VI. I would affirm the judgment of the trial court as to Count VI and concur in the majority opinion in all other respects.

CLIFFORD H. AHRENS, Judge

4